UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| HOMESTEAD BAKING CO. d/b/a HOMESTEAD BAKING COMPANY OF EAST PROVIDENCE, RHODE ISLAND | : | CA 05 062 ML |
| VS. | : | CA NO. 05- |
| BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INT'L UNION, AFL-CIO, LOCAL 348, ART MONTMINY in his representative Capacity of Int'l Vice President; and TIMOTHY BENJAMIN, in his representative Capacity of President/ Business Agent | : | |

**PETITION FOR REMOVAL**

NOW COME the Defendants, Bakery, Confectionery, tobacco Workers and Grain Millers International Union AFL-CIO, Local 348 ("Local 348"); Art Montminy, in his representative capacity as International Vice President ("Mr. Montminy"), and Timothy Benjamin, in his representative capacity as Business Agent of Local 348, pursuant to 28 U.S.C. §§1441 and 1446, and submit this Petition for Removal.

As grounds for removal, the Defendants assert as follows:

1. This civil action was originally brought by a Complaint in the Providence County Superior Court of Rhode Island, which was first received by the defendants on January 18,2 005.

2. The civil action seeks to vacate, modify, and/or correct the October 19, 2004 opinion and award of a labor arbitrator.

2

3. In this civil action, the Plaintiff Company relies on an assertion that the arbitrator "manifestly disregarded the provisions of the Collective Bargaining Agreement, and specifically Article IV, Section A requiring filing of grievances within seven (7) calendar days of the occurrence of the grievance." (See Paragraph 25 of the Providence County Superior Court Complaint that is filed herewith.)

4. The Labor Management Relations Act ("LMRA") provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. §185(a).

5. Under the definitions set forth in the LMRA, the Plaintiff Company is an "employer." See 29 U.S.C. §152(2). The Defendant, Local 348, is a "labor organization" representing employees in an industry "affecting commerce" as those terms are denied in the LMRA. See 29 U.S.C. §§152(5) and (7).

6. Federal district courts have subject matter jurisdiction to vacate, modify, or correct an arbitrator's award under Section 185 of the LMRA. See Harry Hoffman Printing v. Graphic Communications International Local 261, 912 F.2d. 608 (2nd Cir. 1990).

7. This civil action is removable under 28 U.S.C. §1441(a), which provides, in pertinent part, as follows: "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. §1441(a).

8. This civil action is removable under 28 U.S.C. §1441(b), which provides, in pertinent part, that "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the ... laws of the United States shall be removable without regard to the citizenship or residence of the parties." 28 U.S.C. §1441(b).

9. Since the Plaintiff's claims raise federal issues, this civil action, of which the district court has original jurisdiction, is founded on claims arising under the laws of the United States and therefore should be removed pursuant to 28 U.S.C. §§1441(a) and (b). Id.

10. The U.S. District Court for the District of Rhode Island embraces the place where this action is pending in state court and is, therefore, the proper venue. See 28 U.S.C. §§1441(a) and 1446(a).

WHEREFORE, the Defendants submit this Petition for Removal and respectfully urge this Honorable Court to determine that the removal shall be permitted and notify the State court to proceed no further.

Respectfully submitted,

BAKERY, CONFECTIONERY,
TOBACCO WORKERS AND
GRAIN MILLER INT'L UNION,
LOCAL NO. 348,

By its Attorneys,

Marc B. Gursky, Esq. (#2818)
Gursky Law Associates
18 Imperial Place, Suite 1D
Providence, RI 02903
(401) 454-7400
(401) 621-8553 fax

Sheilah F. McCarthy, Esq.
Lenow & McCarthy
13 Pelham Island Road
Wayland, Massachusetts 01778
(508) 358-8181
(508) 358-8989 fax

CERTIFICATION OF SERVICE

I hereby attest that a true copy of the above Notice of Removal was served on Thomas J. McAndrew, Esq., attorney of record for the Plaintiff, by first class mail on this 16th day of February, 2005.

# INDEX TO SUPERIOR COURT PLEADINGS


1. DOCKET SHEET
2. OMNIBUS CALENDAR ASSIGNMENT FORM
3. COMPLAINT

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS PAGE 1
RHODE ISLAND JUDICIAL SYSTEMS AND SCIENCES DATE 01/19/2005
SUPERIOR COURT CIVIL INFORMATION SYSTEM

(1)

DOCKET EVENT LISTING

CASE NO.: PM2005 0269 TYPE ARBITRATION/VACATE
TITLE: HOMESTEAD BAKING CO V BAKERY TOBACCD WORKERS UNION 348
FILING DATE: 01-18-2005 ASSIGNED TO TRIAL POOL:
DESIGNATED TO ARBITRATION:

| | | | |
|---|---|---|---|
| BAKERY TOBACCO WORKERS UNION 3 | BDF | Unknown,Attorney | AOR |
| BENJAMIN,TIMOTHY PRESID | DEF | Unknown,Attorney | AOR |
| EAST PROV HOMESTEAD BAKING CO | BPL | McAndrew,Thomas J. | AOR |
| HOMESTEAD BAKING CO | BPL | McAndrew,Thomas J. | AOR |
| MONTMINY,ART VICE PRE | DEF | Unknown,Attorney | AOR |

| DOC. ID. | DATE | JUDGE | OUTCOME | EFFECTIVE DATE |
|---|---|---|---|---|

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(2)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

# OMNIBUS CALENDAR ASSIGNMENT FORM

SUPERIOR COURT

☒ PROVIDENCE/BRISTOL ☐ KENT ☐ WASHINGTON ☐ NEWPORT

1. HOMESTEAD BAKING CO., ET AL
vs
BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, AFL-CIO, ET AL

2. CASE NO. 05- 0269

3. REQUESTED CALENDAR ASSIGNMENT

☐ J Jury Trial TRIAL CALENDAR ☐ N Non-Jury Trial

4. FORMAL AND SPECIAL CAUSE CALENDAR

☐ AGA Agency Appeal
☐ AOD Assessment of Damages
☐ CNA Confirm Arbitration
☐ CNP Contempt Proceedings
☐ DEJ Declaratory Judgment
☐ EOJ Entry of Judgment
☐ FFR First and Final Report
☐ FRR Foreclosure of Right of Redemption
☐ FRS Friendly Suit
☐ OPC Oral Proof of Claim
☐ MNJ Mandatory Injunction
☐ MEL Mechanic's Lien
☐ MAT Motion to Attach
☐ PRT Partition Proceedings
☐ PAT Petition to Appoint Temporary Receiver
☐ PEN Petition to Enforce
☐ PIN Petition for Instructions
☐ PRE Petition to Reclaim
☐ PES Petition to Sell
☐ PPI Preliminary Injunction
☐ POC Proof of Claim
☐ RCP Receivership Proceedings
☐ SUP Supplementary Proceedings
☐ TRO Temporary Restraining Order
☐ TIP Title Proceedings
☐ TSP Trustee Proceedings
☒ VAR Vacate Arbitration
☐ WOM Writ of Mandamus
☐ WOR Writ of Replevin

☐ OTH Other FSC Matter

DISPOSITIVE MOTION CALENDAR (TUESDAYS, PROV. ONLY)

☐ MTD Motion to Dismiss, Under Rule 12
☐ MJP Motion for Entry of Judgment on Pleadings
☐ MPS Motion for Partial Summary Judgment
☐ MSJ Motion for Summary Judgment

☐ MTN Other Dispositive Motion

HEARING DATE 2-24-05 FSC/MOTION CAL. CLERK C. Ajoa DATE 1-18-05

5. SPECIAL MASTER CALENDAR

☐ CIC Criminal Injury Compensation HEARING DATE CLERK

6. METHOD OF ASSIGNMENT

☐ Motion to Assign ☐ Stipulation to Assign ☐ Court Order Pursuant to Temporary Ex Parte Order

BASED ON METHOD OF ASSIGNMENT, STATE ANY RELEVANT INFORMATION BELOW

7. ATTORNEYS DATE 1-18-05

Signatures [signature] 1001 (Plaintiff's) (Defendant's)

Print Name Thomas J. McAndrew 1001
1 Turks Head Place
Providence, R.I. 02903

8. DATE / TIME STAMP

SUPERIOR COURT
FILED
HENRY S. KINCH JR., CLERK
2005 JAN 18 P 2:

True Copy Attest: [signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

SR-11 (Rev. 2/91) WHITE - COURT YELLOW - PLAINTIFF PINK - DEFENDANT GOLD - CALENDAR CLERK

STATE OF RHODE ISLAND SUPERIOR COURT
PROVIDENCE, SC.

(3)

*************************************

HOMESTEAD BAKING CO., d/b/a HOMESTEAD BAKING COMPANY OF EAST PROVIDENCE, RHODE ISLAND,
Plaintiff

VS. C.A. NO.: 05- 0269

BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION AFL-CIO, LOCAL 348,; ART MONTMINY, in his representative capacity of International Vice President; and TIMOTHY BENJAMIN, in his representative capacity of President/ Business Agent,
Defendants

*************************************

## ***COMPLAINT***

### *I. Nature of the Action*

This is an action pursuant to Rhode Island General Laws, §28-9-18 to Vacate, Modify, and/or Correct the Opinion and Award of Arbitrator John J. Mark dated October 19, 2004 (the "Award") in the matter of a grievance filed on February 6, 2004, some fifty (50) days after the "occurrence" of the event

18630

### *II. Parties*

1. Homestead Baking Co., d/b/a Homestead Baking Company of East Providence, Rhode Island, is a corporation organized under the laws of the State of Rhode Island, and is a party to a Collective Bargaining Agreement with the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union AFL-CIO, Local 348.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

SUPERIOR COURT
FILED
HENRY S. KINCH JR., CLERK
2005 JAN 18 P 2:14

VAR 1001

2. Defendant, Bakery, Confectionery, Tobacco Workers and Grain Millers International Union AFL-CIO, Local 348, upon information and belief, is an unincorporated labor organization organized to represent employees in the collective bargaining process, and has had a representation relationship with employees of the Plaintiff for many years.

3. Defendant, Art Montminy, is the International Vice President of the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, AFL-CIO, and is sued in his representative capacity.

5. Defendant, Timothy Benjamin, is the President and Business Agent of the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union, AFL-CIO, Local 348, and is sued in his representative capacity.

## *III. Facts*

6. On or about September/October, 2003, the Plaintiff and Defendant entered into contract negotiations for a successor Collective Bargaining Agreement to be effective September 28, 2003 through September 30, 2006. The purported Collective Bargaining Agreement is attached hereto as Exhibit #1.

7. Article IV entitled "Grievance and Arbitration Language," states, in relevant part:

> "(A) Grievances shall consist of disputes or disagreements concerning the interpretation and application of the provisions of this Agreement. Such issue shall first be discussed between the Employee and the Shop Chairperson with the Production Superintendent of the Company. Upon failure to reach an amicable adjustment <u>within seven (7) calendar days of the occurrence of the grievance</u>, it shall be reduced to writing by the aggrieved Party and submitted to the other Party who shall then have seven (7) calendar days to respond to the grievance in writing and return the written response to the other party.
>
> ***
>
> (C) If the Business Representative and the Plant Manager are unable to reach an amicable adjustment within ten (10) working days, then, within a period of

rue Copy Attest

ffice of Clerk of Superior Court
ounties of Providence & Bristol
rovidence, Rhode Island

thirty (30) days thereafter, the Union may refer the matter to arbitration as provided herein.

(D) The Parties shall make every effort to select a mutually agreeable Arbitrator. Upon failure to so agree, the Parties shall request the Federal Mediation and Conciliation Service to submit a panel of five (5) suggested Arbitrators from which the selection will be made. The Party processing the grievance to arbitration shall first strike out two (2) names from the list. The name remaining on the list shall be designated the Arbitrator to hear and decide on the grievance."

8. Prior to the filing of the grievance, the Plaintiff had notified the Union President and Business Agent, Timothy Benjamin, on or about December 18, 2003 with respect to the issue of the modification of health care plans (see attached Exhibit #2).

9. Thereafter the Union filed a grievance dated February 6, 2004 (see attached Exhibit #3).

10. The Union thereafter pursued its grievance to arbitration. A hearing was held before Arbitrator John J. Mark on October 5, 2004 to hear evidence with respect to the issue of arbitrability.

11. At that hearing, the company presented evidence that clearly established that the grievance was not timely filed within the meaning of the grievance arbitration provisions of the Collective Bargaining Agreement.

12. The hearing was closed on October 5, 2004, and briefs were invited.

13. Thereafter, the Union submitted a brief, through its counsel, dated October 8, 2004 (see attached Exhibit #4).

14. Attached to that Brief is "Attachment A" a four (4) page Verizon telephone bill from telephone number (508) 820-9234 (see attached Exhibit #5). Significantly, this document was not presented in the presence of the parties, and/or before the Arbitrator.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

15. On or about October 19, 2004, Arbitrator Mark issued his Decision and Award finding the matter in question to be arbitrable (see attached Exhibit #6).

16. In finding the matter to be arbitrable, the Arbitrator stated:

> "Mr. Benjamin stated that he called five or more times and the union's exhibit of telephone calls from the union to the Homestead Baking Company seems to corroborate this." (Emphasis Added) (Paragraph 1, Page 9 of Arbitrator's Decision and Award)

### *IV. Cause of Action*

17. Paragraphs 1 through 15 are hereby realleged and reasserted as if fully set forth herein.

18. The Arbitrator exceeded his authority when he accepted, and thereafter relief upon, an ex parte document submitted by the Union, and attached to its Brief as "Attachment A" (see attached Exhibit #5).

19. The Arbitrator's conduct violates the "fair and regular standards enunciated by the Supreme Court in Spielberg Manufacturing Co., 112 NLRB 1080, 36 LRRM 1152 (1955).

20. The Arbitrator's conduct in accepting a post-hearing document outside the presence of the company, violates Rule 28 of the American Arbitration Association, wherein it states:

> **"28. Evidence**
>
> The parties may offer such evidence as is relevant and material to the dispute, and shall produce such additional evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. An arbitrator authorized by law to subpoena witnesses and documents may do so independently or upon the request of any party. The arbitrator shall be the judge of the relevance and materiality of the evidence offered and conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties except where any of the parties is absent in default or has waived the right to be present." (Emphasis Added)

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

21. The Arbitrator's unilateral decision to accept the Union's purported corroborating evidence (Attachment A to its Brief), further is in violation of Rule 29 of the American Arbitration Association Rules and Regulations regarding "Evidence by Affidavit and Filing of Documents," which states, in relevant part:

> "All documents that are not filed with the arbitrator at the hearing, but arranged at the hearing or subsequently by agreement of the parties to be submitted, shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded opportunity to examine such documents."
> (Emphasis Added)

22. The Arbitrator's Conduct in accepting the post-hearing document from the Union is in violation of The Code of Ethics and Procedural Standards for Labor Management Arbitration wherein it states:

> "When hearings are concluded, parties should not attempt to communicate any additional information to the arbitrator. If new evidence becomes available, written application for the re-opening of the proceedings with the reasons therefore should be made to the arbitrator and a copy transmitted simultaneously to the other party."[1] (Emphasis Added)

23. The Arbitrator's conduct in accepting evidence outside the hearing, without the parties having agreed to same, not only violates the Rules of the American Arbitration Association and The Code of Ethics, but implicates §28-9-18 in that the Arbitrator clearly imperfectly executed the powers vested in him.

24. The Arbitrator's conduct violates all tenants of due process and expected conduct and, therefore, the Decision and Award should be vacated forthwith.

25. In rendering the Award, the Arbitrator manifestly disregarded the provisions of the Collective Bargaining Agreement, and specifically Article IV, Section A requiring filing of grievances within seven (7) calendar days of the occurrence of the grievance.

rue Copy Attest

[1] Part III, §6, 15 LA 961, 966. The Code of Professional Responsibility which was intended to supersede the Code of Ethics is silent on reopening the hearing.

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

26. The Award does not draw from the essence of the Collective Bargaining Agreement.

27. The Award is not based on a passably plausible interpretation of the Collective Bargaining Agreement.

28. The Award is inconsistent with the plain language of the Collective Bargaining Agreement.

29. The Arbitrator's conduct is in violation of the Rules of the American Arbitration Association.

30. In rendering the Award, the Arbitrator reached an irrational result.

31. The Arbitrator is not free to dispense with his own brand of industrial justice, nor is he licensed to violate the tenants of due process, rules, regulations, and code of professional conduct of the American Arbitration Association, with respect to the issue of accepting evidence.

***V. Prayer for Relief***

WHEREFORE, the Plaintiff, Homestead, respectfully prays that the Court enter an Order vacating, modifying, and/or correcting the Award, and grant it such other relief as the Court may deem just and proper.

HOMESTEAD BAKING CO., d/b/a
HOMESTEAD BAKING COMPANY
OF EAST PROVIDENCE, RHODE ISLAND
By its Attorney,

THOMAS J. McANDREW, ESQ. (#1001)
One Turks Head Place, Suite 205
Providence, RI 02903
(401) 455-0350
(401) 455-0882 (FAX)

Dated: January 18, 2005

:rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

# AGREEMENT

With

BAKERY, CONFECTIONERY AND TOBACCO WORKERS
& Grain Millers
INTERNATIONAL UNION, A.F.L. & C.I.O.
LOCAL # 348

And

HOMESTEAD BAKING COMPANY OF
EAST PROVIDENCE, RHODE ISLAND

**Effective date: September 28, 2003- Termination Date: September 30, 2006**

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## TABLE OF CONTENTS


| ARTICLES | | PAGE |
|---|---|---|
| I. | STANDARD DAY AND WEEK | 1 |
| II. | RECOGNITION | 2 |
| III & IV | MEETING AND GRIEVANCE PROCEDURE | 4 |
| V. | SENIORITY AND PROMOTIONS | 5 |
| VI. | VACATIONS | 6 |
| VII. | HOLIDAYS | 8 |
| VIII | CO-OPERATION | 9 |
| IX. | DISMISSALS | 9 |
| X. | LAY-OFF | 9 |
| XI. | UNIFORMS AND WORK CLOTHES | 9 |
| XII. | WAGES | 10 |
| XIII. | BULLETIN BOARDS | 11 |
| XIV. | LUNCH PERIODS AND REST PERIODS | 11 |
| XV. | MILITARY CLAUSE | 11 |
| XVI | CHECK-OFF | 11 |
| XVII. | LEAVE FOR DEATH IN FAMILY | 12 |
| XVIII. | MANUAL WORK BY SUPERVISOR | 12 |
| XIX. | UNION LABEL | 12 |
| XX. | LONG AND FAITHFUL SERVICE | 12 |
| XXI. | PICKET LINE | 13 |
| XXII. | NEW EMPLOYEES | 13 |
| XXIII. | SHIFT SCHEDULES | 13 |
| XXIV. | SUCCESSORS AND ASSIGNEES | 14 |
| XXV. | PYRAMIDING OF OVERTIME | 14 |
| XXVI. | JURY DUTY | 14 |
| XXVII | PENSION PLAN | 14 |
| XXVIII. | SEVERANCE PAY | 16 |
| XXVIX. | NO DISCRIMINATION | 17 |
| XXX. | MANAGEMENT RIGHTS CLAUSE | 17 |
| XXXI. | ENERGY CLAUSE | 17 |
| XXXII. | EMERGENCY CALL-IN PAY | 17 |
| XXXIII. | HEALTH BENEFIT PLAN | 18 |
| XXXIV. | TERM LIFE INSURANCE AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE | 18 |
| XXXV. | VIDEO MONITORING | 19 |
| XXXVI. | PART-TIME EMPLOYEES | 19 |
| XXXVII. | TERMINATION | 20 |
| SUPPLEMENT | V-J DAY AND WORK GUARANTEES | 21 |
| SCHEDULE "A" | CLASSIFICATIONS AND WAGE RATES | 23 |


rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## HOMESTEAD AGREEMENT

This Agreement, made and entered into this _________ day of ______________, 2003, and effective September 28, 2003 by and between the Homestead Baking Company, organized by law and having a usual place of business in the City of East Providence, Rhode Island, hereinafter called the Company (which term shall include its successors and assigns) and the Bakery, Confectionery, Tobacco Workers and Grain Millers Union, Local #348, affiliated with the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union of America, of Massachusetts, hereinafter called the Union (which term shall include its present members and those persons who may become members after the date of this Agreement)

## WITHNESSETH

**Purpose:**

That for the purpose of facilitating the peaceful adjustments of differences that may arise from time to time and promoting harmony and efficiency to the end that the Employees and the Company and the general public may by mutually benefited, the Parties hereto contract and agree with each other as follows:

## ARTICLE I

## STANDARD DAY AND WEEK

(A) The standard work week will be five (5) days. Steady daily employees covered by this Agreement shall not be required to work less than forty (40) hours in any standard week. Steady daily employees shall be guaranteed a minimum of eight (8) hours daily employment. The work week shall begin at 6:00 PM Saturday for payroll purpose.

(B) It is agreed that if the forty (40) hours minimum work week or the five (5) day work week becomes burdensome on the Company, it may take the matter up with the Union, who will give the subject prompt consideration to the end that a mutual adjustment may be reached. However, this matter will not be subject to Arbitration.

(C) All hours worked over and above eight (8) in any one day and all hours worked over and above forty (40) hours in any one week shall be considered overtime hours. Such overtime hours shall be compensated for at time and one-half of the required hourly rate of pay. Overtime shall be paid either on a daily basis or a weekly basis, whichever is greater; but in no instance shall it be paid on both a daily and weekly basis.

(D) No employee shall be required to return to work in less than twelve (12) hours after the completion of his day's work.

(E) The two days off to which each employee will be entitled by reason of the

rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

five (5) day work week need not be consecutive; however, occasions may arise when it might become necessary for the Employer to require that work be performed on the sixth and/or seventh day in a normal week, and the fifth, sixth and/or seventh day in a holiday week. The Union, therefore, agrees that if under such circumstances, it cannot supply qualified workers as required by the Company, it and the Shop Committee will cooperate with the Company by having the regular Employees work the extra day or days; and, such employees shall be paid at time and one-half for all hours worked on the sixth day and double time for all hours worked on the seventh day in any normal week.

(F) All hours worked over and above twelve (12) in any one day shall be paid @ double the employee's straight time hourly rate.

**Four Day Work Schedule:**

(1) The Employer may establish a basic straight time work week of four ten hour work days. All employees working in excess of ten hours, exclusive of lunch time, shall be compensated at one and one half time hourly rate, for all hours in excess of ten.

(2) The fifth and sixth day of work, will be paid at one and one half times the straight time hourly rate. The seventh day of work, will be paid at two times the straight time hourly rate.

(3) Lunch periods will occur three to five hours after employees starts work. All employees shall be granted three ten minute rest periods during their normal ten hour straight time work shift. Each employee required to work beyond ten hours will be given an additional rest period as soon as possible after the end of ten hours.

(4) The employer may elect to work a four and five day, forty hour schedule in the same work week, but not with the same employee.

(5) All hours worked over and above twelve (12) in any one day shall be paid @ double the employee's straight time hourly rate.

## ARTICLE II

## RECOGNITION

(A) The Company recognizes the Union as the sole Collective Bargaining Agent as to wages, hours, working terms and conditions of employment covering full-time and part-time roll-production employees, cakes, pastry, English muffin production employees, shipping room employees, porters, freight-handlers, maintenance employees and lead persons. **HOWEVER**, notwithstanding any other language to the contrary which is contained in the Agreement, part-time employees shall have only those rights and benefits set forth in **ARTILCE XXXIV** below, entitled Part-Time Employees. Part-Time employees shall have no additional rights under this contract except those

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

specifically enumerated in **ARTICLE XXXIV**, below.

(B) It shall be a condition of employment that all of the Employer's Employees in the contractual bargaining unit who are members of the Union in good standing on either the effective date of the Agreement or the execution date, whichever is later, shall remain members in good standing for the term of the Agreement; those employees in the unit who are not members on the latter of those two dates shall become Union members on the thirty-first (31st) day following after the effective date or the execution of the Agreement, whichever is later, and remain good standing members for the term of the Agreement. All new Employees in the unit shall become Union members on the thirty-first (31st) day following the beginning of such employment, and remain good standing member for the term of the Agreement.

(C) The Company has the exclusive right to discharge new employees without assigning any reason at any time within the trial period of sixty (60) days. However, all new employees in the Unit will become Union members on the thirty-first (31st) day following the beginning of such employment, and remain good-standing members for the term of the Agreement.

(D) No obligation on the part of the Company discharge any employee under this Article is incurred if membership in the Union was not made available to the Employee on the same terms and conditions applying to other members, or if the employee has been denied membership or have had their membership terminated for reasons other than:

(1) Their failure to pay a reasonable initiation fee thirty-one (31) day after applying for membership

(2) Their failure to pay their monthly Union Dues.

(3) Failure to pay assessments.

(E) It is further agreed that, if the Labor Management Relations Act of 1947 is amended to permit it, the provisions of Article II of the 1947 Agreement between the parties relative to hiring will become effective immediately.

(F) The Union shall notify the Employer, in writing, of any failure of any employee to maintain good standing, and the Employer shall notify the employee of the receipt of such notice, and if the employee dose not adjust his standing upon such notification, the Employer shall discharge the employee.

(G) The Employer shall notify the Union monthly, whenever employees are hired, giving their names, addresses, Social Security numbers, and the job classification in which they shall work. The Employers shall have new employees complete a Union Membership application, a check-off authorization card, at the same time they complete

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

their job application and remit these forms to the local Union office weekly.

## ARTICLE III

## MEETING AND GREIVANCE PROCEDURE

(A) The Company agrees to confer with the Business Representative, representatives or committees of the Union at any reasonable time to discuss differences, disagreements or other business within the jurisdiction of the Union and in reference to Employees covered by this Agreement. At any time during working hours it shall be permissible for the Union Official, upon due notice to Management, to enter the Plant to inspect and observe the working conditions therein.

## ARTICLE IV

(A) Grievances shall consist of disputes or disagreements concerning the interpretation and application of the provisions of this Agreement. Such issue shall first be discussed between the Employee and the Shop Chairperson with the Production Superintendent of the Company. Upon failure to reach an amicable adjustment within seven (7) calendar days of the occurrence of the grievance, it shall be reduced to writing by the aggrieved Party and submitted to the other Party who shall then have seven (7) calendar days to respond to the grievance in writing and return the written response to the other party.

(B) The matter shall then be discussed between the Union Business Representative and the Plant Manager, or such other representative designated by the Employer for that purpose.

(C) If the Business Representative and the Plant Manager are unable to reach an amicable adjustment within ten (10) working days, then, within a period of thirty (30) days thereafter, the Union may refer the matter to arbitration as provided herein.

(D) The Parties shall make every effort to select a mutually agreeable Arbitrator. Upon failure to so agree, the Parties shall request the Federal Mediation and Conciliation Service to submit a panel of five (5) suggested Arbitrators from which the selection will be made. The Party processing the grievance to arbitration shall first strike out two (2) names from the list. The name remaining on the list shall be designated the Arbitrator to hear and decide on the grievance.

(E) The Arbitrator shall not be empowered to modify, add to, subtract from or otherwise after the provisions of this Agreement. His decision shall be final and binding upon the Employer, the Union and the Employee.

(F) No Employee shall have the right to Arbitration, this right being reserved to the Union exclusively.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(G) The costs of the Arbitration, except those individually incurred, shall be shared equally by the Union and the Company.

(H) In view of the foregoing procedure for the settlement of grievances, there shall be no lockouts or strikes or stoppages of work during the term of the Agreement.

(I) The Union Chief Steward shall be paid $10.00 weekly over and above his Classification Wage Rate or an additional 25 cents per hour.

## ARTICLE V

## SENIORITY AND PROMOTIONS

(A) The company recognizes the principle of Seniority for layoffs and promotions in the classifications covered by this Agreement. Notice of job vacancy shall be posted on the Bulletin Board by the Employer for three (3) working days and shall contain an adequate description of the job, starting time, and rate of pay. Job bids will be filled within two (2) weeks of opening.

Preference will be given to the most senior Employee, provided such employee is qualified to perform such work. The Company shall by the judge of the Employee's qualifications; however, the committee may discuss any alleged disqualifications with the Company.

An Employee, after a successful bid, must remain on the job for a period of six (6) months before such employee may bid again, except when a job opening is for advancement or better hours.

Any employee shall be given thirty (30) days to qualify.

The Employer may post "Training Bids" in the Mixer and English Muffin Divider Operator Classifications only. Bids will be awarded by seniority, and shall be in effect for a maximum of three (3) months. The purpose of these bids is to allow the Employer to have train employees in the key positions noted above. Employees shall remain on their respective permanent bid jobs when not training, but shall be awarded the position as a permanent job if an opening occurs during the three (3) month period noted above. Employees shall receive the rate of pay as provided for in schedule "A" for all hours spent working in training bid positions. Only one (1) Training Bid per shift in these two (2) classifications may be in effect ay any time.

(B) If an employee occupies a higher-rated position over four (4) hours, he shall receive the higher rate for the actual number of hours so worked.

(C) When an employee is required to temporarily take the place of any other employee receiving a lower rate of pay, the higher rate of pay shall be paid.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(D) If any employee bids permanently to a classification which calls for a lower rate of pay, he/she shall receive the lower rate of pay.

(E) An employee shall lose his seniority if he voluntarily quits; if he is discharged and such discharge is not reversed by the grievance procedure herein provided for; if he is laid off for a period of longer than six (6) months; if he overstays his leave of absence and no further extension to his leave of absence is granted; or if he fails to report to work after notification by telephone, telegraph or mail directed to his last known address. A copy of such notice shall be forwarded to the Union office.

An employee granted a leave of absence not exceeding three (3) months shall retain his seniority. However, a leave of absence of the above-mentioned may be extended between the Company and the Union. In describing what shall constitute a leave of absence, it shall be done by an exchange of letters between the Union and the Company.

(F) In the event that any job or classification should by abolished or discontinued, the employee or employees so involved shall elect such position as their seniority entitles them, and the employee whom they displace, shall elect such positions as their seniority entitles them. This provision shall not apply to 1st and 2nd Class Repair Men. Moves under this provision shall be subject to the ability of the employee to perform the job.

(G) A seniority list and Vacation Schedule shall be posted no later then February 1st of each year.

## ARTICLE VI

## VACATIONS

(A) The Company agrees that:

(1) All steady daily full-time employees who have been continuously employed in a full-time capacity for one (1) year shall receive one (1) week's vacation.

(2) All steady daily full-time employees who have been continuously employed in a full-time capacity for three (3) years shall receive two (2) week's vacation.

(3) All steady daily full-time employees who have been continuously employed in a full-time capacity for five (5) years shall receive three (3) week's vacation.

True Copy Attest

(4) All steady daily full-time employees who have been continuously

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

employed in a full-time capacity for fifteen (15) years shall receive four (4) week's vacation.

(5) All steady daily full-time employees who have been continuously employed in a full-time capacity for twenty (20) years shall receive five (5) week's vacation.

(6) All steady daily full-time employees who have been continuously employed in a full-time capacity for twenty-five (25) years shall receive six (6) week's vacation.

(B) The qualifying date for the purpose of determining as of such date whether an employee has had continuous employment of three (3) years, five (5) years, fifteen (15) years, twenty (20) years, or twenty-five (25) years shall be December 31st of each year.

(C) For the purpose of clarification the words "Continuously employed" shall apply only to full-time employees. No employee shall accrue any vacation credits for time worked in a part-time capacity.

In cases of absence for any case totaling eighty-six (86) days or more, an employee who has been continuously employed in a full-time capacity for one (1) year or more, shall be entitled to a pro-rata vacation on the basis of one-twelfth (1/12th) of his current vacation eligibility for each month in which the employee works fifteen (15) days or more. The eighty-five (85) day limitation does not include time lost to Jury Duty for the length of time served, National Guard Duty of up to two (2) weeks, Holidays not worked, time spent on vacation, and absences of up to three (3) days due to death in the immediate family.

(D) Employee's vacation shall fall in the vacation period scheduled, such Employee shall have to follow the seniority list of the vacation schedule. Such employee hired prior to July 1 of any year, shall be entitled to one full week in the next calendar year. Employee's hired after June 30th shall be pro-rated and paid for vacation earned.

(E) For the purpose of computing vacation pay, it shall be as follows:

(1) It shall be no less than forty-four (44) hours at the Employee's straight time rate of pay.

(F) Effective January 1, 1989, each employee shall select his vacation by seniority, but with due regard for the efficient operation of the Company. No employee shall be permitted to select more than two (2) weeks of vacation for the time period between Memorial Day and Labor Day. The employer agrees to allocate three (3) vacation selections per week. ***The Employer agrees to provide separate vacation lists for Production and Maintenance employees.***

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(G) If an Employee fails to give the Company a two (2) week notice that he will terminate his employment with the Company, he shall lose two (2) weeks of vacation.

## ARTICLE VII

## HOLIDAYS

(A) New Year's Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Armistice Day, Thanksgiving Day, Christmas Day, and Washington's Birthday shall be known as holidays.

Four (4) days shall constitute the basic work week in which a holiday occurs.

Employees shall be guaranteed thirty-two (32) hours of work.

Time and one-half shall be paid for all hours worked over thirty two (32) hours in a holiday week and time and one-half shall be paid on the fifth day in a holiday week.

Double time shall be paid for all hours worked on the sixth (6th) day and also the seventh (7th) day in a holiday week.

In order to qualify for holiday pay, an employee must actually work his full scheduled workday immediately proceeding and his full scheduled workday immediately following such holiday. It is agreed however, that if an employee is absent on either one of these two (2) days due to an excused absence he shall be paid for the holiday. Holiday pay shall be paid at the rate of eight (8) hours straight time.

It is further agreed, that all employees shall be given a day off either the day of the holiday or the day before the holiday.

When an Employee's vacation falls on a holiday week, said Employee shall be paid an extra day's pay or will be given an extra day off.

(B) When an Employee is required to work the day before and also the day of the holiday, he shall not be required to work less than eight (8) hours on the day of or the day before the holiday. Such work, so performed, shall not diminish his benefit in the aforementioned holiday week.

(C) New Employees shall not be entitled to holiday pay during the first thirty (30) days of their employment.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTICLE VIII

## CO-OPERATION

The Union agrees that during the term of this Agreement neither the Union, nor any of its members or agents, will cause any suspension of work nor be engaged in any strike of any kind against the Homestead Baking Company; likewise, the Employer agrees that, during the term of this Agreement, the Homestead Baking Company will not engage in the manufacturing of bakery products for resale by any competitive wholesaler or house to house baking concern which may be experiencing labor difficulties. This provision shall be effective to the extent permitted by law.

## ARTICLE IX

## DISMISSALS

(A) It is agreed that full power to discipline and discharge shall remain with the Company, but it shall be exercised with justice and due regard for the reasonable rights of the Workers. If the Union feels that an Employee has been unjustly discharged, it may take the matter up with the Company within five (5) days. In the event the matter cannot be satisfactorily adjusted between the Union and the Company, the matter can be referred to Arbitration as herein provided.

(B) If the decision of the Arbitrator shall be that the Employee has been discharged without just cause, he shall be returned to the position held by him at the time of his discharge according to the terms and conditions of the opinion and award of the Arbitrator.

## ARTICLE X

## LAY-OFF

No steady daily full-time Employees with one (1) year or more of continuous employment shall be laid off without one (1) week's notice or one (1) week's pay in lieu thereof.

## ARTICLE XI

## UNIFORMS AND WORK CLOTHES

The Company will pay for five (5) complete launderings each week of any uniform the Company requires the Employees covered by this Agreement to wear. Such uniforms to bear the Union label where practical.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTICLE XII

## WAGES

(A) Classification wage rates shall be set forth below and as per attached Schedule "A".

(1) Effective September 28, 2003 there will be a general increase wage of Twenty-five (25) cents per hour for all full-time, hourly Employees covered by this Agreement.

(2) Effective September 26, 2004 there will be a general wage increase of Twenty-five (25) cents, per hour, for all full-time, hourly Employees covered by this Agreement.

(3) Effective September 25, 2005 there will be a general wage increase of Twenty-five (25) cents, per hour, for all full-time, hourly Employees covered by the Agreement.

| 9/28/03 | 9/26/04 | 9/25/05 |
|---|---|---|
| **$.25** | **$.25** | **$.25** |

The following classifications will also be adjusted by additional Five (5) cents per hour on 9/28/03, an additional Five (5) cents per hour on 9/26/04 an additional Five (5) cents per hour on 9/25/05.

Maintenance #1 through and including Muffin Bagger Operator

The amount paid for Clothes-Changing time under previous Agreement was converted into the wage rates of July 31, 1960 and the wage rates in Schedule "A" include such amounts. It is understood and agreed that if, at any time in the future, the Company should be required by law or otherwise to pay separately for Clothes-Changing time, then at that time the wage rates for each classification provided by the Agreement and any Supplement thereto then in effect shall be reduced by the amount to be paid separately for such Clothes-Changing time.

(B) The Company shall pay a bonus of ten (10) cents per hours for all hours worked between the hours of 6:00 P.M. and 6:00 A.M.

(C) New, inexperienced employees hired shall be paid at a rate of eighty (80%) percent of the job rate in the classification in which they are working for the first six (6) months of employment and ninety (90%) percent of the job rate in the classification in which they are working for the next six (6) months of employment.

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTILCE XIII

## BULLETIN BOARDS

The Company agrees to provide space for a bulletin board for the posting of notices of the Company addressed to the Employees and notices of the Union addressed to its members. The Bulletin Board shall be located at a convenient place in the plant.

## ARTICLE XIV

## LUNCH PERIODS AND REST PERIODS

(A) Arrangements will be made for time off for lunch periods. Such periods shall be arranged to provide continuous operation where necessary and will occur three (3) to five (5) hours after Employees start work.

(B) Employees shall be granted two (2) ten (10) minute rest periods within each eight (8) hour day. Employees who are required to work more than nine (9) hours per day shall be granted an additional ten (10) minute rest period for each two (2) hours they are required to work thereafter.

## ARTICLE XV

## MILITARY CLAUSE

(A) Whenever an Employee of the Company enters the Military or armed forces of the United States Government Service, his seniority and restatement rights shall be governed by the applicable provisions of the Selective Training and Service Act of 1948 and any amendments thereto.

## ARTICLE XVI

## CHECK-OFF

The Company agrees to deduct the dues, initiation fees, assessments, and BCTGM-PAC contributions of the Union from the pay of each Employee who has authorized such deductions in writing.

The Union dues and the BCTGM-PAC contributions shall be deducted on the first pay day of each month and remitted to the Local Union's Financial Secretary Treasurer not later than the end of the month in which deductions are made.

The initiation fees, dues, assessments and the BCTGM-PAC contributions shall be deducted by the Company thirty-one (31) day from their date of employment for all new employees and remitted to the Financial Secretary Treasurer of the Local Union not

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

later than ten (10) days after the deductions for that current month are made.

## ARTICLE XVII

## LEAVE FOR DEATH IN FAMILY

In the event of a death in the Employee's immediate family, I.e., Father, Father-in-Law, Mother, Mother-in-Law, Sister, Brother, Son, Daughter, it is recognized by the Parties that three (3) consecutive calendar days may be needed by the Employee to attend the funeral service. If any of these three (3) days are working days, the Employee shall suffer not loss in pay. The last of these three (3) days shall be the day of the funeral.

Each day pay shall be eight (8) hours at the Employee's straight time hourly rate.

In the event that the spouse of an employee dies, the employee shall receive seven (7) calendar days off and suffer no loss of pay.

Employees shall be granted two (2) days off, to attend the funeral services for the Grandparents, Brother-in-Law, Sister-in-Law. The last of these two (2) days shall be to attend the funeral.

An employee's schedule shall not be altered due to a death in family.

## ARTICLE XVIII

## MANUAL WORK BY SUPERVISOR

No work shall be performed by any Employee not represented by the Union, except in cases of emergencies or for the purpose of giving instructions.

## ARTICLE XIX

## UNION LABEL

The Company agrees to the use of the Union Label of the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union AFL & CIO on its principal loaf of bread.

## ARTICLE XX

## LONG AND FAITHFUL SERVICE

Employees who have had a record of long and faithful service and who have become unable to handle or engage in heavy work will be, as far as practicable, transferred to work more suitable and in keeping with their physical condition.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTICLE XXI

## PICKET LINE

It is agreed that the Union cannot guarantee that its members will pass through picket lines of any Union or Unions of organized groups of Employees who are on strike or are locked out and the Union, Local 348, has notified the Company, in writing, that such strike or lockout is in progress.

The Union and its members shall only be considered responsible for the performance of work, if the Employees can perform their work without molestation or interference and if they are not endangered by physical violence or threats thereof.

The provision shall be effective to the extent permitted by law.

## ARTICLE XXII

## NEW EMPLOYEES

The Company agrees to furnish the Union with the names and classifications of new Employees hired within one (1) week from date of hiring.

## ARTICLE XXIII

## SHIFT SCHEDULES

(A) The schedule for all regular, full-time employees shall be posted by ***Thursday*** of the current workweek, and may be changed with forty eight (48) hours advance notice on the bulletin board or otherwise be made know to the concerned employee(s), and the Shop Chairperson will be notified before the schedule is posted.

(B) Employees may give a 24 hour notice that they will leave after ten (10) hours of work and the Employer shall make every effort to assist the employee as long as there is not concerted action t leave. Further, the Employer agrees to honor advance requests for no overtime, when possible, provided such requests are made in writing to supervision.

(C) Once and employee bid job is finished and has completed 12 hours of work, any additional work after is voluntary.

(D) If an employee's shift is changed by more than four (4) hours and said change continues for more than two (2) weeks, he may select another shift according to his seniority.

rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTICLE XXIV

## SUCCESSORS AND ASSIGNEES

This Agreement shall be binding upon the successors and assignees of both Parties.

## ARTICLE XXV

## PYRAMIDING OF OVERTIME

There shall be no pyramiding of overtime.

## ARTICLE XXVI

## JURY DUTY

Should an Employee, who has completed his probationary period, be called upon to serve as a member of the Jury, either the Federal Courts or the State Courts, he shall be paid by the Employer for the length of time he must serve on the Jury, the difference between the amount of Jury Duty Pay he received and the straight-time wages he would have received from the Employer if he had been actively employed by the Employer during his time as a juror. As a condition for the receipt of Jury Duty Pay, an Employee must report for work during his term of Jury Service upon any of his scheduled work days as he may be excused by the Court from serving as a juror.

## ARTICLE XXVII

## PENSION PLAN

The Employer and the Local Union agree that the only agreement between the said Local Union and the Employer regarding Pension or Retirement for Employees covered by the Collective Bargaining Agreement is as follows:

1. (A) Effective February 3, 1988 and for the duration of the current Collective Bargaining Agreement and any renewals or extensions thereof, all eligible employees in the Local Union's bargaining unit shall be covered by the Homestead Baking Company, Inc. Retirement Plan.

   (B) The Employer shall maintain said Plan for the duration of this Agreement.

   (C) The provisions of said plan are set forth in document entitled

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Homestead Baking Company, Inc. Retirement Plan. Said Document was written by Compensation Planning Associates, Inc. of 615 Jefferson Boulevard, Warwick, Rhode Island, and includes the following sections:

(a) An Administration Guide
(b) Plan Documents
(c) Qualification
(d) Anniversary Reports (for Union Members)

Said Plan and all of the documents are incorporated herein by reference, as if restated herein in full.

(D) Notwithstanding any other provisions to the contrary, the Employer shall contribute per calendar year, for the benefit of all of the Employer's employees (union and non-union) who are eligible for said plan. Contributions shall be increased as follows:

***Effective 12/31/03 $134,500.00***

***Effective 12/31/04 $137,000.00***

***Effective 12/31/05 $139,500.00***

2. The parties agree to represent that there is no other Agreement between them regarding pensions, other than this Article, presently in effect. The parties further agree that no agreement regarding pension benefits other than this Article shall be effective during the period covered by the said Collective Bargaining Agreement, except with the consent of the Board of Trustees.

3. This Article shall be binding upon the Parties hereto, their successors, administrators, executors, and assigns. In the event that the Employer sells, leases or transfers this Company or any part hereof, or is taken over by assignment, receivership or bankruptcy proceedings, the successors shall be bound by the terms and conditions of this Article for the life hereof. The Employer shall give notice of the existence of this Article to any purchaser, transferee, lessee, assignee, or other successor in interest. Such notice shall by in writing with the copy to the Trustees, not later than ten (10) days prior to the effective date of the transaction. The Employer agrees that its failure to so notify its successors and the Trustees will operate to continue its obligations under this Article.

4. Full-Time workers to receive minimum average $1,500.00 per year.

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## ARTILCE XXVIII

## SEVERANCE PAY

1. It is agreed that each full-time Employee who is displaced from his employment by reason of the permanent closing of an entire plant or the permanent closing of a department thereof, by the introduction of labor saving equipment, or by layoff shall by compensated for such displacement provided he has been actively employed by the Employer for a period of at least three (3) years from his last date of hire. An eligible Employee's compensation for his displacement shall be on the basis of thirty (30) hours of severance pay at his straight time hourly rate of pay for each full year, or major portion thereof, of such employment commencing with the fourth (4th) year thereof. Payment under this formula shall be limited to a maximum of nine hundred (900) hours of Severance Pay.

2. The above-described Severance Pay will not be paid to:

(A) Any Employee who is offered employment with the Company at the same location.

(B) Any Employee who accepts a job with the Company at any location.

(C) Any Employee who voluntarily quits or is discharged for cause before he is separated from employment by the Company.

3. Any Employee accepting Severance Pay shall forfeit and cease to have any seniority and recall rights as provided for in this Agreement.

4. Any Employee re-employed after receiving Severance Pay shall be considered a new Employee from the date of re-employment.

5. In the event an eligible Employee wishes to remain on the Plant seniority list, for the purpose of possible recall, he may elect to defer acceptance of his Severance Pay for a period of twelve (12) months. At any time during such period, however, he may request his Severance Pay and his rights of recall and seniority shall terminate as of that date.

If such Employee has not been recalled by the end of such period, he shall be paid his Severance Pay and his right to recall and seniority shall terminate as of that date.

6. Hours of Severance Pay shall be included for the purpose of determining contributions to the Health Benefit and Pension Funds covered by this Agreement.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

7. If the Employee sells his plant to persons or person and such persons or person close the present Bakery, Severance Pay shall be paid under the provisions of this Article.

8. Effective July 15, 1977, there shall be no accruing of future years to the Severance Pay Clause.

## ARTICLE XXIX

## NO DISCRIMINATION

Both Parties to this Agreement agree that they will not discriminate against any Employee or prospective Employee because of his or her race, sex, age, creed, national origin or Union Affiliation.

## ARTICLE XXX

## MANAGEMENT RIGHT CLAUSE

The Union agrees that the Company has and shall retain the exclusive right and power to manage the Plant and business of the Company, and that the Company may, in connection therewith, promulgate such rules and regulations, that the Company shall, in its sole discretion deem advisable, provided that nothing herein contained shall be deemed to limit or restrict the rights of the Union or the Employees as expressly set forth herein, and provided further, that the rights and powers of the Company may not be exercised for the purpose of discrimination against any employee because of his Union membership or by reason of his Union activities.

## ARTICLE XXXI

## ENERGY CLAUSE

The daily and weekly guarantee shall be inapplicable in the event of a shutdown or reduced work week due to energy shortages. Such energy shortages must be verified by the authority responsible for the curtailment or energy supplier curtailing the supply.

## ARTICLE XXXII

## EMERGENCY CALL-IN PAY

(A) When an Employee (Maintenance) is called in to report for work on emergency call, he shall be guaranteed a minimum of four (4) hours pay for such emergency, whether or not four (4) hours is either available or necessary to complete the job.



rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(B) Employees shall be paid for such emergency call-in time, four (4) hours pay, or time and one-half, whichever is the greater, provided the Emergency call-in time is between the hours of termination of his previous shift and two (2) hours before the start of his next shift.

## ARTICLE XXXIII

## HEALTH BENEFIT PLAN

(A) The Company will provide each Full-Time Employee while in the Company's employ and who works at least ninety-six (96) hours in the proceeding month, without cost to the Employee, and in accordance with the Employee's family status, the following health benefits:

***Those Benefits set forth in the Homestead Baking Company Health Insurance Plan***

***For purposes of this section, family status shall include employees that are married, married with children, or single with custody of their children.***

(B) The Group Insurance Health Benefit Plan agreed to between the Company and the Union, including a full and detailed description of eligibility requirements and all other conditions, is to be set forth in a printed booklet to be attached to and made part of this Agreement, as soon as available.

(C) The Company agrees to provide the Homestead Group Insurance Health Benefit Plan for the duration of this Agreement. ***The Company further agrees that the Group Health Insurance Plan will remain substantially comparable to the current Plan for the life of this Agreement.***

(D) If an employee does not qualify for his/her health care benefits due to a non-work related illness or accident, the Employer agrees to continue health care coverage for an additional thirty (30) days for those employees with less than five (5) years of service, and for sixty (60) days for those employees with five (5) or more years of service. ***Employees must have been employed for a minimum of one (1) year for this provision to be enabled. Employees must have returned to work from a non-work related illness or accident for one (1) year to be re-eligible for this provision.***

## ARTICLE XXXIV

## TERM LIFE AND ACCIDENTAL DEATH & DISMEMBERMENT INSURANCE, NON-OCCUPATIONAL SICKNESS AND ACCIDENT BENEFIT

(A) The Company will provide each full-time employee with term life insurance and accidental death and dismemberment insurance in the principal sum of $10,000.00.



True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(B) ***The Company will provide each full-time employee with a non-occupational sickness and accident benefit of one hundred dollars ($100) per week, for a maximum of twenty-six (26) weeks.***

## ARTICLE XXXV

## *VIDEO MONITORING*

***The parties agree that the Company's video cameras may be used as disciplinary documentation for subjects of gross misconduct such as:***

***Fighting***
***Stealing***
***Harassment***
***Horseplay considered dangerous to others***
***Deliberate recklessness***
***Negligent use of equipment or property***
***Possession of firearms or dangerous weapons***
***Product adulteration***

## ARTICLE XXXVI

## PART-TIME EMPLOYEES

(A) The Company and Union recognize that from time to time both parties benefit if the Company hires part-time employees to perform bargaining unit work. The parties further recognize that the rights, benefits and obligations of part-time employees are limited to and by the provisions of this Article.

(B) It is understood and agreed that part-time workers may be employed and are to become members of the Union after the thirtieth (30th) day from the date of employment.

(C) Each part-time employee will receive no less than four (4) hours pay for each day when they are requested by the proper Company official to report to work.

(D) Part-time employees shall accrue Seniority (as defined in Article V) within the category of part-time employees only. Length of service by a part-time employee shall not be credited in the event a part-time employee bids for and is awarded steady, daily, full-time employment.

True Copy Attest

(E) Part-time employees will be given preference to steady, daily, full-time



Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

employment if qualified for the job. If two or more qualified part-time employees bid for steady daily full-time employment, the part-time employee with the greatest part-time seniority shall be given preference.

(F) In the event a part-time employee becomes a full-time employee his/her length of service as a part-time employee will not be credited towards his/her service as a full-time employee. Part-time employees who become full-time employees will be treated as new hires and subject to the terms and conditions of Article I-XXXIII, above.

(G) It is understood and agreed that part-time workers who work thirty two (32) hours or more in any holiday week shall be paid the holiday pay.

(H) New Employees shall not be entitled to holiday pay during the first thirty (30) days of their employment.

(I) Part-timers shall be paid at eighty (80%) percent of the rate for the classification in which they are working. After two years the Part-timer shall receive Term Life and Accidental Death & Dismemberment Insurance, and full rate of pay.

(J) Definition: Part-time work shall be considered as all work done by an employee before he bids on a full-time position and shall include seasonal work from May 1st to October 1st. It is understood and agreed that whenever the Company can guarantee a forty (40) hour work week in any job classification, this position must be put up for bid.

(K) Seasonal Employees hired between May 1st and October 1st will not receive Health coverage. Should such employee remain with the Company they shall receive single coverage immediately upon eligibility.

(L) Each part-time employee who completes ninety (90) days of continuous employment shall receive Individual Medical Coverage, under the Company Plan, and an option to purchase Family Coverage, under the same plan, for the difference in the Company's cost between the Individual and Family Plan. The ninety (90) day requirement will begin upon the date of hire.

## ARTICLE XXXVII

## TERMINATION

(A) This Agreement and the provisions hereto supersede all previous Agreements between the Parties hereto and shall be in full force and effect on both Parties from ***September 28, 2003*** to and including ***September 30, 2006*** and automatically thereafter from year to year, unless terminated by either Party on a sixty (60) day written notice to the other Party of their desire to terminate this Agreement. Such written notice will be given sixty (60) days prior to the above expiration date.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(B) Should either the Union or the Company desire to change or amend this Agreement, written notice of such desire will be given the other Party sixty (60) days prior to the above expiration date.

(C) During negotiations of the new Contract, the provisions of this Agreement may be continued by mutual agreement.

**IN WITNESS WHEREOF:** The Parties hereto execute this agreement in duplicate on this_______ day of__________, 2001

**FOR THE COMPANY:**
**HOMESTEAD BAKING COMPANY**

**FOR THE UNION BAKERY:**
**CONFECTIONERY, TOBACCO**
and **GRAIN MILLERS UNION**
**LOCAL # 348**

________________________________ ________________________________

## SUPPLEMENT

Agreement between the Homestead Baking Company and the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, AFL & CIO, effective October 1, 2000 to and including September 27, 2003.

(1) **V-J DAY**

The Company agrees that during the week in which V-J Day occurs, all steady full-time Employees shall be guaranteed forty (40) hours work or pay for five day work week. In the event it is necessary for an employees to work six (6) days during this week, they shall be paid at the rate of time and one-half for all hours worked on the day considered their holiday.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(2) **EXCEPTION TO WORK GUARANTEES**

It is understood and agreed that the provisions of Article I, providing for work guarantees and the one week's notice or one week's pay in lieu thereof contained in Article X, shall not apply in the event that the Company's plant is unable to be operated in is usual course of business because of fires, folds, acts of God or strikes involving other crafts employed by the Company at its Bakery or Agency, or strikes in other industries which affect the ability of the Employer to operate.

**IN WITNESS WHEREOF:** The Parties hereto execute this Supplement in duplicate on this _______ day of _________, 2001

**FOR THE COMPANY:**
**Homestead Baking Company**

______________________

**FOR THE UNION:**
**Bakery, Confectionery, Tobacco, and Grain Millers Union**
**Local # 348**

______________________

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## SCHEDULE "A"

## CLASSIFICATIONS AND WAGE RATES

| CLASSIFICATIONS | EFFECTIVE DATES AND HOURLY RATE | | |
|---|---|---|---|
| | 9/28/03 | 9/26/04 | 9/25/05 |
| Maintenance #1 | $14.90 | $15.20 | $15.50 |
| Maintenance #2 | $14.65 | $14.95 | $15.25 |
| Working Forepersons* | $14.65 | $14.95 | $15.25 |
| Mixers | $14.46 | $14.76 | $15.06 |
| Ovens | $14.04 | $14.34 | $14.64 |
| Bread & Roll Divider Operator | $14.04 | $14.34 | $14.64 |
| Muffin Divider Operator | $14.04 | $14.34 | $14.64 |
| Bread & Roll Bagger Operator | $14.04 | $14.34 | $14.64 |
| Muffin Bagger Operator | $13.89 | $14.19 | $14.49 |
| Depanner | $13.84 | $14.09 | $14.34 |
| Shippers | $13.55 | $13.80 | $14.05 |
| Vacation Relief | $13.55 | $13.80 | $14.05 |
| Sanitation | $13.55 | $13.80 | $14.05 |
| General Help | $13.55 | $13.80 | $14.05 |
| Bread & Roll Packers | $13.55 | $13.80 | $14.05 |
| Indexer | $13.55 | $13.80 | $14.05 |
| Shaker | $13.55 | $13.80 | $14.05 |

*The above wage rate in Working Forepersons classification represents a minimum wage.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Kavanagh's BAKERY PRODUCTS

NEW ENGLAND FRESH

Homestead Baking Company
145 North Broadway
Rumford, Rhode Island 02916
TEL: (401) 434-0551
1 (800) 556-7216
FAX: (401) 438-0542

English Muffins
Breads
and Rolls

# FAX COVER SHEET

FROM: P VICAR

DATE: Dec 18 2003

TO: TIM BENJAMIN

NUMBER OF PAGES SENT: 7

(INCLUDING THIS ONE)

REGARDING: NEW HEALTH BENEFITS

CALL IF YOU HAVE ANY QUESTIONS OR WISH TO HAVE A MEETING WITH ME OR UNITED

[signature]

Note: If any of these fax copies are illegible, or you do not receive the same number of pages indicated above, of if you are not the addressee, please contact us immediately at (401) 434-0551 or (800) 556-7216. Our fax number is (401)438-0542.

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

# UnitedHealthcare Choice Plus *Plan 38B*

As part of our commitment to keeping you in control of your health care decisions, our Choice Plus plan gives you the freedom to see any doctor in the UnitedHealthcare Choice network, including specialists, without a referral. You can even visit any out-of-network physician and still enjoy your benefits with somewhat higher deductibles and copayments.

With our Choice Plus plan, the vast majority of your health care needs are covered with little or no out-of-pocket costs when you visit a network doctor or facility. Plus, when you visit network doctors and hospitals, there aren't any claim forms or bills to worry about.

*Some of the Important Benefits of Our Choice Plus Plan for Covered Services:*

Visit any doctor in the Choice network in your area, including specialists, without designating a primary physician.

Visit any network hospital in your area.

You can choose to seek services outside our network, normally at a higher copayment and/or deductible.

Emergencies are covered anywhere in the world.

Benefits are available for office visits and hospital care, as well as inpatient and outpatient surgery, when covered health services are provided.

Prenatal care is included.

Routine check-ups are included.

Childhood immunizations are provided.

Mammograms are included.

Pap smears are included.

Vision and hearing screenings are covered.

Care Coordination℠ services are available to help identify and prevent delays in care for those who might need specialized help.

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

# **Choice Plus** *Benefits Summary*

| Types of Coverage | Network Benefits/ Copayment Amounts | Non-Network Benefits / Copayment Amounts |
|---|---|---|
| This Benefit Summary is intended only to highlight your Benefits and should not be relied upon to fully determine coverage. This benefit plan may not cover all of your health care expenses. **More complete descriptions of Benefits and the terms under which they are provided are contained in the Certificate of Coverage that you will receive upon enrolling in the Plan.**<br>If this Benefit Summary conflicts in any way with the Policy issued to your employer, the Policy shall prevail.<br>Terms that are capitalized in the Benefit Summary are defined in the Certificate of Coverage.<br>Where Benefits are subject to day, visit and/or dollar limits, such limits apply to the combined use of Benefits whether in-Network or out-of-Network, except where mandated by state law.<br>Network health care services under this benefit plan are covered only when provided, arranged or authorized by a Network Physician.<br>*Prior Notification is required for certain services received from non-Network providers. | UnitedHealthcare of New England, Inc. is financially responsible for Network Benefits.<br>**Annual Deductible:** $500 per Covered Person per calendar year, not to exceed $1,000 for all Covered Persons in a family.<br>**Out-of-Pocket Maximum:** No Out-of-Pocket Maximum<br>**Maximum Policy Benefit:** No Maximum Policy Benefit | United HealthCare Insurance Company is financially responsible for Non-Network Benefits.<br>**Annual Deductible:** $1,000 per Covered Person per calendar year, not to exceed $2,000 for all Covered Persons in a family.<br>**Out-of-Pocket Maximum:** $5,000 per Covered Person, per calendar year, not to exceed $10,000 for all Covered Persons in a family. The Out-of-Pocket Maximum does not include the Annual Deductible. Copayments for some Covered Health Services will never apply to the Out-of-Pocket Maximum as specified in Section 1 of the COC.<br>**Maximum Policy Benefit:** $1,000,000 per Covered Person |
| **1. Ambulance Services - Emergency only** | Ground Transportation: No Copayment<br>Air Transportation: 0% of Eligible Expenses | Same as Network Benefit |
| **2. Dental Services - Accident only** | *No Copayment<br>*Prior notification is required before follow-up treatment begins. | *Same as Network Benefit |
| **3. Durable Medical Equipment**<br>Network and Non-Network Benefits for Durable Medical Equipment are limited to $2,500 per calendar year. | No Copayment | *30% of Eligible Expenses<br>*Prior notification is required when the cost is more than $1,000 |
| **4. Emergency Health Services** | $100 per visit | *Same as Network Benefit<br>*Notification is required if results in an Inpatient Stay. |
| **5. Eye Examinations**<br>Refractive eye examinations are limited to one every other calendar year from a Network Provider. | $15 per visit | 30% of Eligible Expenses<br>Eye Examinations for refractive errors are not covered. |
| **6. Home Health Care**<br>Network and Non-Network Benefits are limited to 6 home or office Physician's visits per month, 3 nursing visits per week and 20 hours of home health aide visits per week. | No Copayment | *30% of Eligible Expenses |
| **7. Hospice Care**<br>Network and Non-Network Benefits are limited to 360 days during the entire period of time a Covered Person is covered under the Policy. | No Copayment | *30% of Eligible Expenses |
| **8. Hospital - Inpatient Stay** | No Copayment | *30% of Eligible Expenses |
| **9. Injections Received in a Physician's Office** | $15 per visit | 30% per injection |
| **10. Maternity Services** | Same as 8, 11, 12 and 13<br>No Copayment applies to Physician office visits for prenatal care after the first visit.<br>*Notification is required if Inpatient Stay exceeds 48 hours following a normal vaginal delivery or 96 hours following a cesarean section delivery. | Same as 8, 11, 12 and 13<br>*Notification is required if Inpatient Stay exceeds 48 hours following a normal vaginal delivery or 96 hours following a cesarean section delivery. |
| **11. Outpatient Surgery, Diagnostic and Therapeutic Services** | No Copayment | 30% of Eligible Expenses |

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

| Types of Coverage | Network Benefits/ Copayment Amounts | Non-Network Benefits / Copayment Amounts |
|---|---|---|
| **12. Physician's Office Services** | $15 per visit. No Copayment applies when a Physician charge is not assessed. | 30% of Eligible Expenses. No Benefits for preventive care. |
| **13. Professional Fees for Surgical and Medical Services** | No Copayment | 30% of Eligible Expenses |
| **14. Prosthetic Devices**<br>Network and Non-Network Benefits for prosthetic devices are limited to $2,500 per calendar year. | No Copayment | 30% of Eligible Expenses |
| **15. Reconstructive Procedures** | Same as 8, 11, 12, 13 and 14 | *Same as 8, 11, 12, 13 and 14 |
| **16. Rehabilitation Services -Outpatient Therapy**<br>Network and Non-Network Benefits are limited as follows: 20 visits of physical therapy; 20 visits of occupational therapy; 20 visits of speech therapy; 20 visits of pulmonary rehabilitation; and 36 visits of cardiac rehabilitation per calendar year. | $15 per visit | 30% of Eligible Expenses |
| **17. Skilled Nursing Facility/Inpatient Rehabilitation Facility Services**<br>Network and Non-Network Benefits are limited to 60 days per calendar year. | No Copayment | *30% of Eligible Expenses |
| **18. Transplantation Services** | *No Copayment | *No Benefits |
| **19. Urgent Care Center Services** | $50 per visit | 30% of Eligible Expenses |

## Additional Benefits

| | | |
|---|---|---|
| **Cancer Therapies – Investigational** | Same as 8, 11, 12, 13 and 14 | Same as 8, 11, 12, 13 and 14 |
| **Diabetes Services** | 0% of Eligible Expenses for equipment and supplies<br>$15 per visit for diabetes self-management education | 30% of Eligible Expenses for equipment and supplies<br>$15 per visit for diabetes self-management education |
| **Infertility Services** | 20% of Eligible Expenses | 20% of Eligible Expenses |
| **Mental Health and Substance Abuse Services – Outpatient**<br>Must receive prior authorization through the Mental Health/Substance Abuse Designee. Network and Non-Network Benefits for Mental Health Services are limited to 30 visits per calendar year.Network and Non-Network Benefits for Substance Abuse Services are limited to 30 visits per calendar year. | $15 per individual visit; $10 per group visit. | No Benefits |
| **Mental Health and Substance Abuse Services – Inpatient and Intermediate**<br>Must receive prior authorization through the Mental Health/Substance Abuse Designee.Network and Non-Network Benefits for Substance Abuse Services are limited to 30 days per calendar year.Network and Non-Network Benefits for Substance Abuse Services for detoxification are limited to 5 detoxification occurances or 30 days per calendar year, whichever comes first. | No Copayment | No Benefits |
| **Spinal Treatment**<br>Benefits include diagnosis and related services and are limited to one visit and treatment per day. Benefits are limited to 24 visits per calendar year. | $15 per visit | No Benefits |

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## Exclusions UnitedHealthcare of New England, Inc. and United HealthCare Insurance Company

Except as may be specifically provided in Section 1 of the Certificate of Coverage (COC) or through a Rider to the Policy, the following are not covered:

### A. Alternative Treatments

Acupressure; hypnotism; rolfing; massage therapy; aroma therapy; acupuncture; and other forms of Alternative Treatment.

### B. Comfort or Convenience

Personal comfort or convenience items or services such as television; telephone; barber or beauty service; guest service; supplies, equipment and similar incidental services and supplies for personal comfort including air conditioners, air purifiers and filters, batteries and battery chargers, dehumidifiers and humidifiers; devices or computers to assist in communication and speech.

### C. Dental

Except as specifically described as covered in Section 1 of the COC for services to repair a sound natural tooth that has documented accident-related damage, dental services are excluded. There is no coverage for services provided for the prevention, diagnosis, and treatment of the teeth, jawbones or gums (including extraction, restoration, and replacement of teeth, medical or surgical treatments of dental conditions, and services to improve dental clinical outcomes). Dental implants and dental braces are excluded. Dental x-rays, supplies and appliances and all associated expenses arising out of such dental services (including hospitalizations and anesthesia) are excluded, except as might otherwise be required for transplant preparation, initiation of immunosuppressives, or the direct treatment of acute traumatic Injury, cancer, or cleft palate. Treatment for congenitally missing, malpositioned, or super numerary teeth is excluded, even if part of a Congenital Anomaly.

### D. Drugs

Prescription drug products for outpatient use that are filled by a prescription order or refill. Self-injectable medications. Non-injectable medications given in a Physician's office except as required in an Emergency. Over-the-counter drugs and treatments.

### E. Experimental, Investigational or Unproven Services

Experimental, Investigational or Unproven Services are excluded. The fact that an Experimental, Investigational or Unproven Service, treatment, device or pharmacological regimen is the only available treatment for a particular condition will not result in Benefits if the procedure is considered to be Experimental, Investigational or Unproven in the treatment of that particular condition.

### F. Foot Care

Routine foot care (including the cutting or removal of corns and calluses); nail trimming, cutting, or debriding; hygienic and preventive maintenance foot care; treatment of flat feet or subluxation of the foot; shoe orthotics.

### G. Medical Supplies and Appliances

Devices used specifically as safety items or to affect performance primarily in sports-related activities. Prescribed or non-prescribed medical supplies and disposable supplies including but not limited to elastic stockings, ace bandages, gauze and dressings, ostomy supplies, syringes and diabetic test strips. Orthotic appliances that straighten or re-shape a body part (including some types of braces). Tubings and masks are not covered except when used with Durable Medical Equipment as described in Section 1 of the COC.

### H. Mental Health/Substance Abuse

Services performed in connection with conditions not classified in the current edition of the Diagnostic and Statistical Manual of the American Psychiatric Association.

Services or supplies for the diagnosis or treatment of Mental Illness, alcoholism or substance abuse disorders that, in the reasonable judgment of the Mental Health/Substance Abuse Designee, are any of the following:

Not consistent with prevailing national standards of clinical practice for the treatment of such conditions.

Not consistent with prevailing professional research demonstrating that the services or supplies will have a measurable and beneficial health outcome.

Typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective.

Not consistent with the Mental Health/Substance Abuse Designee's level of care guidelines or best practices as modified from time to time.

The Mental Health/Substance Abuse Designee may consult with professional clinical consultants, peer review committees or other appropriate sources for recommendations and information regarding whether a service or supply meets any of these criteria.

### I. Nutrition

Megavitamin and nutrition based therapy; nutritional counseling for either individuals or groups.

Enteral feedings and other nutritional and electrolyte supplements, including infant formula and donor breast milk.

### J. Physical Appearance

Cosmetic Procedures including, but not limited to, pharmacological regimens; nutritional procedures or treatments; salabrasion, chemosurgery and other such skin abrasion procedures associated with the removal of scars, tattoos, and/or which are performed as a treatment for acne. Replacement of an existing breast implant is excluded if the earlier breast implant was a Cosmetic Procedure. (Replacement of an existing breast implant is considered reconstructive if the initial breast implant followed mastectomy.)

Physical conditioning programs such as athletic training, bodybuilding, exercise, fitness, flexibility, and diversion or general motivation. Weight loss programs for medical and non-medical reasons. Wigs, regardless of the reason for the hair loss.

### K. Providers

Services performed by a provider with your same legal residence or who is a family member by birth or marriage, including spouse, brother, sister, parent or child. This includes any service the provider may perform on himself or herself.

### L. Reproduction

Surrogate parenting. The reversal of voluntary sterilization..

### M. Services Provided under Another Plan

Health services for which other coverage is required by federal, state or local law to be purchased or provided through other arrangements, including but not limited to coverage required by workers' compensation, no-fault automobile insurance, or similar legislation. If coverage under workers' compensation or similar legislation is optional because you could elect it, or could have it elected for you, Benefits will not be paid for any Injury, Mental Illness or Sickness that would have been covered under workers' compensation or similar legislation had that coverage been elected.

Health services for treatment of military service-related disabilities, when you are legally entitled to other coverage and facilities are reasonably available to you. Health services while on active military duty.

### N. Transplants

Health services for organ or tissue transplants are excluded, except those specified as covered in Section 1 of the COC. Any solid organ transplant that is performed as a treatment for cancer.

Health services connected with the removal of an organ or tissue from you for purposes of a transplant to another person. Health services for transplants involving mechanical or animal organs.

Transplant services that are not performed at a Designated Facility. Any multiple organ transplant not listed as a Covered Health Service in Section 1 of the COC.

### O. Travel

Health services provided in a foreign country, unless required as Emergency Health Services.

Travel or transportation expenses, even though prescribed by a Physician. Some travel expenses related to covered transplantation services may be reimbursed at our discretion.

### P. Vision and Hearing

Purchase cost of eye glasses, contact lenses, or hearing aids. Fitting charge for hearing aids, eye glasses or contact lenses. Eye exercise therapy. Surgery that is intended to allow you to see better without glasses or other vision correction including radial keratotomy, laser, and other refractive eye surgery.

### Q. Other Exclusions

Health services and supplies that do not meet the definition of a Covered Health Service - see definition in Section 10 of the COC.

Physical, psychiatric or psychological examinations, testing, vaccinations, immunizations or treatments otherwise covered under the Policy, when such services are: (1) required solely for purposes of career, education, sports or camp, travel, employment, insurance, marriage or adoption; (2) relating to judicial or administrative proceedings or orders; (3) conducted for purposes of medical research; or (4) to obtain or maintain a license of any type.

Health services received as a result of war or any act of war, whether declared or undeclared, or caused during service in the armed forces of any country.

Health services received after the date your coverage under the Policy ends, including health services for medical conditions arising prior to the date your coverage under the Policy ends.

Health services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Policy.

In the event that a non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for the health service for which Copayments and/or the Annual Deductible are waived.

Charges in excess of Eligible Expenses or in excess of any specified limitation.

Services for the evaluation and treatment of temporomandibular joint syndrome (TMJ), whether the services are considered to be medical or dental in nature.

Upper and lower jaw bone surgery except as required for direct treatment of acute traumatic Injury or cancer. Orthognathic surgery, jaw alignment, and treatment for the temporomandibular joint, except as a treatment of obstructive sleep apnea.

Surgical treatment and non-surgical treatment of obesity (including morbid obesity).

Growth hormone therapy; sex transformation operations; treatment of benign gynecomastia (abnormal breast enlargement in males); medical and surgical treatment of excessive sweating (hyperhidrosis); medical and surgical treatment for snoring, except when provided as part of treatment for documented obstructive sleep apnea. Oral appliances for snoring.

Custodial care; domiciliary care; private duty nursing; respite care; rest cures.

Psychosurgery. Speech therapy except as required for treatment of a speech impediment or speech dysfunction that results from Injury, stroke or Congenital Anomaly.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

This summary of Benefits is intended only to highlight your Benefits and should not be relied upon to fully determine coverage. This plan may not cover all your health care expenses. Please refer to the Certificate of Coverage for a complete listing of services, limitations, exclusions and a description of all the terms and conditions of coverage. If this description conflicts in any way with the Certificate of Coverage, the Certificate of Coverage prevails. Terms that are capitalized in the Benefit Summary are defined in the Certificate of Coverage.

# UnitedHealthcare

## *Pharmacy Management Program* ***Plan 001***

UnitedHealthcare's pharmacy management program provides clinical pharmacy services that promote choice, accessibility and value. The program offers a broad network of pharmacies (more than 50,000 nationwide) to provide convenient access to medications.

While most pharmacies participate in our network, you should check first. Call your pharmacist or visit our online pharmacy service at www.myuhc.com. The online service offers you home delivery of prescriptions, ability to view personal benefit coverage, access health and well being information, and even location of network retail neighborhood pharmacies by zip code.

## Copayment per Prescription Order or Refill

For a single Copayment, you may receive a Prescription Drug Product up to the stated supply limit. Some products are subject to additional supply limits. You are responsible for paying the lower of the applicable Copayment or the retail Network Pharmacy's Usual and Customary Charge, or the lower of the applicable Copayment or the mail order Pharmacy's Prescription Drug Cost.

Also note that some Prescription Drug Products require that you notify us in advance to determine whether the Prescription Drug Product meets the definition of a Covered Health Service and is not Experimental, Investigational or Unproven.

| | Generic Prescription Drug Product | Brand-name Prescription Drug Product on the Preferred Drug List* | Brand-name Prescription Drug Product not on the Preferred Drug List* |
|---|---|---|---|
| Retail Network Pharmacy<br>For up to a 31 day supply | **$7** | **$25** | **$40** |
| Mail Service Network Pharmacy<br>For up to a 90 day supply | **$17.50** | **$62.50** | **$100** |
| Retail Non-Network Pharmacy<br>For up to a 31 day supply | **$7** | **$25** | **$40** |

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

*Our Preferred Drug List includes those drugs available to you at the most affordable cost. It is one of the best ways to maximize your prescription drug benefits. The drug list, developed by physicians and pharmacists on our national Pharmacy and Therapeutics committee, includes a wide selection of generic and brand name prescription medications commonly prescribed by physicians. The Preferred Drug List is updated throughout the year. The most current version is available at our online pharmacy at www.myuhc.com.

# Other Important Cost Sharing Information

**NOTE:** If you purchase Prescription Drug Product from a Non-Network pharmacy, you are responsible for any difference between what the Non-Network pharmacy charges and the amount we would have paid for the same Prescription Drug Product dispensed by a Network pharmacy.

| | Network and Non-Network Pharmacy |
|---|---|
| Annual Drug Deductible | **No Annual Drug Deductible** |

# Exclusions

*Exclusions from coverage listed in the Certificate apply also to this Rider. In addition, the following exclusions apply:*

Outpatient Prescription Drug Products obtained from a non-Network Pharmacy.

Coverage for Prescription Drug Products for the amount dispensed (days supply or quantity limit) which exceeds the supply limit.

Drugs which are prescribed, dispensed or intended for use while you are an inpatient in a Hospital, Skilled Nursing Facility, or Alternate Facility.

Experimental, Investigational or Unproven Services and medications; medications used for experimental indications and/or dosage regimens determined by us to be experimental.

Prescription Drug Products furnished by the local, state or federal government. Any Prescription Drug Product to the extent payment or benefits are provided or available from the local, state or federal government (for example, Medicare) whether or not payment or benefits are received, except as otherwise provided by law.

Prescription Drug Products for any condition, Injury, Sickness or mental illness arising out of, or in the course of, employment for which benefits are available under any workers' compensation law or other similar laws, whether or not a claim for such benefits is made or payment or benefits are received.

Any product dispensed for the purpose of appetite suppression and other weight loss products.

Compounded drugs that do not contain at least one ingredient that requires a Prescription Order or Refill.

Drugs available over-the-counter that do not require a Prescription Order or Refill by federal or state law before being dispensed. Any drug that is therapeutically equivalent to an over-the-counter drug.

A specialty medication Prescription Drug Product (such as immunizations and allergy serum) which, due to its characteristics as determined by us, must typically be administered or supervised by a qualified provider or licensed/certified health professional in an outpatient setting. This does not apply to Depo Provera and other injectable drugs used for contraception.

Durable Medical Equipment. Prescribed and non-prescribed outpatient supplies, other than the diabetic supplies and inhaler spacers specifically stated as covered.

Replacement Prescription Drug Products resulting from a lost, stolen, broken or destroyed Prescription Order or Refill.

General and Injectable Vitamins, except the following which require a Prescription Order or Refill: prenatal vitamins, vitamins with fluoride, and single entity vitamins.

Prescription Drug Products for smoking cessation.

Unit dose packaging of Prescription Drug Products.

Medications used for cosmetic purposes.

New Prescription Drug Products and/or new dosage forms until they are reviewed and approved by our Pharmacy and Therapeutics Committee.

Prescription Drug Products, including new Prescription Drug Products, or new dosage form that are determined to not be a Covered Health Service

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

This summary of Benefits is intended only to highlight your Benefits for outpatient Prescription Drug Products and should not be relied upon to determine coverage. *Your plan may not cover all your outpatient prescription drug expenses.* Please refer to your Outpatient Prescription Drug Rider and the Certificate of Coverage for a complete listing of services, limitations, exclusions and a description of all the terms and conditions of coverage. If this description conflicts in any way with the Outpatient Prescription Drug Rider or the Certificate of Coverage, the Outpatient Prescription Drug Rider and Certificate of Coverage will govern. Capitalized terms in the Benefit Summary are defined in the Outpatient Prescription Drug Rider and/or Certificate of Coverage.

# GRIEVANCE FORM

B.C.T.G.M
LOCAL 348

EMPLOYEE On behalf of Local 348

DEPARTMENT All SHIFT All JOB CLASSIFICATION All

DATE OF HIRE ____ FOREMAN Peter Vican

DATE OF GRIEVANCE February 6, 2004

NATURE OF GRIEVANCE By the following and related conduct the Company has violated the Collective Bargaining Agreement by not supplying a Health Care that is similarly comparable to the (previous) Health Care Plan

CAUSE OF CONTRACT VIOLATED All applicable clauses

SETTLEMENT DESIRED The Company to supply the member with a similar plan to what they had. To reimburse all member any out of pocket expence that may have been added to them due to cha

DATE FILED 2/6/04 SIGNATURE OF EMPLOYEE ____

STEWARD AND DEPT. [signature]

3RD STEP DISPOSITION OF GRIEVANCE At negotiations Homestead Baking Co agreed to maintain a Health Plan similarly comparable to the "current" Health Plan i.e. Flex Plan 500 which was submitted at negotiations and agreed to by both parties

Signature of Foreman or Other Representative of Company Peter Vican DATE Feb 12, 2004

4TH STEP DISPOSITION OF GRIEVANCE ____

Signature Of Company Representative ____ DATE ____

GRIEVANCE NUMBER ____

Shana acknowledged receipt 2/12/2004

Faxed to Sheila 9/30/2004

Fax to Jim Benjamin 2/12/2004

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

2:14PM P1

FEDERAL MEDIATION AND CONCILIATION SERVICE
BEFORE
JOHN J. MARK, ARBITRATOR

| | |
|---|---|
| In the matter of<br><br>BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, LOCAL 348<br><br>and<br><br>HOMESTEAD BAKING COMPANY | FMCS # 040331-04982-3 |

# UNION'S BRIEF on ARBITRABILITY

From the office of:

Sheilah F. McCarthy, Esq.
LENOW & McCARTHY
13 Pelham Island Road
Wayland, MA 01778

(508) 358-8181
(508) 358-8989 (FAX)

October 8, 2004

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

## I. ISSUE

At the hearing that took place on October 5, 2004, the company disclosed for the first time its intent to present evidence only on its perceived issue of procedural arbitrability and further indicated that it had come to the hearing unprepared to present its defense on the merits of the case. Specifically, the company stated its assertion that the union filed its grievance fifty (50) days after the "occurrence" and, citing the contract's seven-day limitation on filing written grievances, argued that it was, therefore, untimely.[1] The union disputed the company's claim that there is a viable arbitrability issue and did not agree to a stipulated issue. Ultimately, the arbitrator bifurcated the proceedings and agreed to decide the arbitrability issue before scheduling another day of hearing on the merits. Briefs on procedural arbitrability are due to be mailed by the parties directly to the arbitrator and postmarked no later than Friday, October 8, 2004. The arbitrator will issue his decision on arbitrability by the week of October 18, 2004.

## II. GRIEVANCE AND ARBITRATION LANGUAGE

The grievance and arbitration procedure (See Joint Exh. 1, Article IV) of the collective bargaining agreement provides, in relevant part, as follows:

> (A) Grievances shall consist of disputes or disagreements concerning the interpretation and application of the provisions of this Agreement. Such issue shall first be discussed between the Employee and the Shop Chairperson with the Production Superintendent of the Company. Upon failure to reach an amicable adjustment within seven (7) calendar days of the occurrence of the grievance, it shall be reduced to writing by the aggrieved Party and submitted to the other Party who shall then have seven (7) calendar

True Copy Attest

[1] The company also made a somewhat vague assertion that the union's request for arbitration was untimely, but did not cite any particular language in the contract to support that assertion.

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

days to respond to the grievance in writing and return the written response to the other party.

***

(C) If the Business Representative and the Plant Manager are unable to reach an amicable adjustment within ten (10) working days, then, within a period of thirty (30) days thereafter, the Union may refer the matter to arbitration as provided herein.

(D) The Parties shall make every effort to select a mutually agreeable Arbitrator. Upon failure to so agree, the Parties shall request the Federal Mediation and Conciliation Service to submit a panel of five (5) suggested Arbitrators from which the selection will be made. The Party processing the grievance to arbitration shall first strike out two (2) names from the list. The name remaining on the list shall be designated the Arbitrator to hear and decide on the grievance.

III. FACTS

On the merits, this case involves a dispute over the interpretation of new language in the collective bargaining agreement's health insurance clause. The language in question was negotiated by the parties in the context of successor contract negotiations that took place in the fall of 2003. (See Management Exh. 3) Specifically, the new language provides as follows:

> (C) The Company agrees to provide the Homestead Group Insurance Health Benefits Plan for the duration of this Agreement. The Company further agrees that the Group Health Insurance Plan will remain substantially comparable to the current Plan for the life of this Agreement.[2]

[2] The company is attempting to make much of the fact that the plan is described in this new contract language as the "Homestead" plan. (See Management Exh. 3, Section (C)). However, this argument is a red herring. The health insurance clause of the predecessor contract also refers to the "Homestead" plan. (See Joint Exh. 1, p.25, Section (A)). Moreover, this reference to the "Homestead" plan did not change in Section (A) of the Stipulation. AS the foregoing plainly demonstrates, there is nothing new about referring to the health insurance plan as the "Homestead" plan. Thus, the company's contention that the reference to the "Homestead" plan in Section (C) of the Stipulation's health insurance clause somehow informs the meaning of the phrase "the current Plan" or in any way modifies its common sense meaning is void of any merit.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(See Management Exh. 3)(Emphasis added). Mr. Montminy explained that Mr Vican came to the bargaining table asking for some flexibility[3] to explore other options in health insurance plans while the union came to the table seeking to maintain their health insurance benefits, particularly by maintaining the employer's 100% premium payment and keeping out-of-pocket costs to employees to a minimum. The above-quoted language of Section (C) is what the parties eventually agreed to.

The evidence showed that the Stipulation of Agreement ("Stipulation"), which spells out all the agreed upon modifications to the 2000-2003 collective bargaining agreement, was negotiated by the parties over the course of four (4) meetings that took place in September, 2003. The Stipulation was signed by the parties on September 19, 2003. (See Management Exh. 3)

The uncontroverted testimony of Timothy Benjamin and Arthur Montminy demonstrated that the union was aware that the health insurance plan that was in place and covering their bargaining unit members at Homestead in the fall of 2003 was BlueChip Flex Plan 10/20 ("Plan 10/20") and that Plan 10/20 was scheduled for renewal at the beginning of March, 2004. While at the bargaining table, Mr. Vican, the company's spokesperson, provided the union with information about the benefits under BlueChip Flex Plan 500 ("Plan 500"). In addition, Mr. Vican made it known at the

---

The company presented no credible evidence concerning the bargaining history behind the Stipluation's health insurance language that would permit the conclusion that "the current Plan" was intended by the parties to mean anything other than the health insurance plan that was in place and covering the bargaining unit employees at the time the language was being negotiated, i.e. the BlueChip Flex Plan 10/20.

[3] As Mr. Montminy's explained, although the agreed upon language gives the company the flexibility to purchase a health insurance plan other than the "current Plan," a change in the plan, while arguably a likelihood, was by no means a certainty.

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

table that he was planning to investigate at least one other health insurance plan as another possible replacement for Plan 10/20.

Further undisputed and unambiguous testimony from Mr. Benjamin and Mr. Montminy showed that the union discussed the problems it had with Plan 500, in particular the annual deductible and the office visit co-payments. Mr. Montminy testified emphatically and unequivocally that, not only did the union not agree to Plan 500, it expressly stated that Plan 500 was unacceptable.

Section (B) of the CBA's health insurance clause – a provision of that clause that did not change whatsoever as a result of the parties' 2003 negotiations – provides as follows:

> (B) The Group Insurance Health Plan agreed to between the Company and the Union, including a full and detailed description of eligibility requirements and all other conditions, is to be set forth in a printed booklet to be attached to and made part of this Agreement, as soon as available.

((See Joint Exh. 1 and Management Exh. 3)(Emphasis added).

In a communication dated December 18, 2003, the company forwarded the union the description of another health insurance plan known as UnitedHealthcare Choice Plus Plan 38B ("Unite Plan"). Although Mr. Vican's cover note on the December 18 fax described the United Plan as "New Health Benefits," he also suggested to Mr. Benjamin that he "call if you have any questions or wish to have a meeting with me or United." (See Management Exh. 6) Mr. Vican's December 18 communication did not indicate when any change in health insurance would take effect.

Although the December 18 fax actually arrived at the union's office while Mr. Benjamin was on vacation, Mr. Benjamin tried to contact Mr. Vican to object to the "new health benefits" immediately after he came back from vacation and reviewed the

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

facsimile transmission from Mr. Vican. (See copy of phone bill from Local's office covering the period in question as "Attachment A"). This phone bill corroborates Mr. Benjamin's testimony which shows that he placed several calls to Mr. Vican, starting on December 23, 2003. Mr. Benjamin explained that he attempted to contact Mr. Vican several times to discuss this matter. Each time he called Mr. Vican to discuss this issue, he was unable to reach him but left a detailed message indicating the nature of his call. Mr. Vican has voicemail.

It is undisputed that the UnitedHealthcare Choice Plus Plan 38B, which had significantly higher out-of-pocket expenses for employees (e.g. annual deductibles and increased office visit co-pays), went into effect on February 1, 2004. Mr. Benjamin filed the grievance in this matter on February 6, 2004 and Mr. Vican responded on February 12, 2004. (See Management Exh. 7)[4] In the company's answer to the grievance, it failed to object to the timeliness of its filing. (See Management Exh. 7).

The union's phone bill would support the inference that it was not until after the grievance in this matter was filed (February 6, 2004) that Mr. Vican actually took Mr. Benjamin's call and they had a conversation. (See attached bill, which shows a February 9, 2004 call of 12.9 minutes in duration.)

In a letter dated February 24, 2004, the union through counsel referred the matter to arbitration. (A copy of February 24, 2004 letter is attached hereto as

[4] As noted during the February 5, 2004 hearing, the union disputes Mr. Vican's claim that he responded to the February 6 grievance by faxing a three-page document to the union office on February 12. Rather, the union contends that Mr. Vican faxed only one page. (See Union Exh. 2) The union was able to produce a document that shows that it received the company's response on the grievance form, and that the completed form was page "001" of the fax. (See Union Exh. 2) In contrast, according to Mr. Vican's recollection, which was unsupported by documentation, the grievance form that he transmitted to the union should have been page "002," the middle page of the alleged three-page transmission. (See Management Exh. 7). In addition, during the hearing, the union denied that Mr. Vican ever transmitted to the union the handwritten undated letter that appears as the third page of Management Exhibit 7.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

"Attachment B"). Since Mr. Vican failed to respond to the union's request to contact it about the selection of a mutually agreeable arbitrator, in a letter dated March 24, 2004, the union submitted a request to the FMCS for a panel of five (5) arbitrators. (A copy of the March 24, 2004 letter is attached hereto as "Attachment C").

## IV. ARGUMENT

### THE GRIEVANCE IS ARBITRABLE

The Company has raised an arbitrability defense based on Mr. Vican's assertion that the "occurrence" of the grievance was December 18, 2004 and that, therefore, under the terms of Section (A) of the grievance procedure, the grievance should have been filed within seven (7) days of that date. Mr. Vican claims that the grievance was filed fifty (50) days after the occurrence.

The contract's grievance procedure (see Jt. Exh. 1, Article IV) clearly provides that the initial phase of any grievance is oral and begins with a discussion of the dispute. In this case, the Mr. Benjamin's repeated attempts to contact Mr. Vican to discuss this matter were ignored. At some point, clearly Mr. Benjamin determined that his efforts to discuss this dispute with Mr. Vican were futile and he proceeded to file the written grievance on February 6, 2004, which was within seven (7) days of the implementation of the objectionable health insurance plan.

The company's argument on the timeliness of the grievance rests on its claim that the contract violation "occurred" on December 18, 2004. The company arrives at claim by relying on Section (B) of the health insurance clause, a clause that did not change in the 2003 negotiations, which provides that the health insurance plan is "made part of" the CBA "as soon as available." (See Joint Exh. 1 and Management Exh. 3). However, the company's argument conveniently disregards other language of Section

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(B), which provides that it is only the "agreed to" health insurance plan that is "made part of" the CBA.

The company has failed to present any evidence to support the conclusion that the parties ever agreed to either the UnitedHealthcare plan or the Plan 500. Mr. Montminy's testimony supports the conclusion that the union expressly refused to agree to Plan 500. And the undisputed evidence showed that the union never even received the information describing the UnitedHealthcare plan until Mr. Benjamin saw the December 18 fax. Further, there is no evidence that the union ever agreed to that plan. In sum, the company's claim that the UnitedHealthcare plan somehow became a part of the CBA on December 18, 2003, despite the absence of an agreement on the plan (and despite the fact that the new plan did not become effective or cover any employees in the unit until February 1, 2004) has no merit.

At the hearing, Mr. Vican also indicated that he believed the submission to arbitration was untimely, but he never made it clear what contract language he was relying on to support that assertion. Since the facts show that the union did in fact refer the matter to arbitration within thirty days of not resolving the matter at the top step of the grievance procedure, there is no basis to conclude that the referral was untimely. The fact it took the parties some time to select the arbitrator is immaterial.

Typically, arbitrators resolve any doubts as to the interpretation of contractual time limits or as doubts as to whether such time limits, even if clear and unambiguous, have been met against forfeiture of the right to process the grievance. See Elkouri & Elkouri, How Arbitration Works, 5th Ed., p. 277. In this case, the contract language on time limits is subject to more than one interpretation. The seven-day limit on filing a written grievance presupposes that representative

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

of the union and a representative of the company have had a discussion in an effort "to reach an amicable adjustment," but, crediting the company's testimony, no such discussion took place. The thirty-day limit on referring a case to arbitration was satisfied with the union's February 24, 2004 correspondence. Moreover, the company's failure to respond to the February 24 letter, i.e. its failure to "make effort to select a mutually agreeable Arbitrator" makes the company's complaints as to the speed with which the matter was processed rather specious at best.

Moreover, arbitrators have held that "timeliness is an affirmative defense that can be waived by an employer either intentionally or by failure to assert the defense at the appropriate time." Id., n. 302. "Regardless of the procedure followed during the steps leading to arbitration, if a party does not timely object to the arbitrability of the grievance, but instead waits until the hearing or shortly before the hearing to object, the arbitrator will likely find that the party waived the objection." Id. at p. 38 of the 1999 supplement.

In light of the foregoing, the union respectfully urges the Arbitrator to find the company has failed to carry it burden of proof – by a preponderance of the evidence – in its claim that the grievance is not procedurally arbitrable and to further order that the parties proceed forthwith to schedule another day of hearing in order to present their respective cases on the merits.

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Respectfully submitted,

BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, LOCAL 348,

By its attorney,

Sheilah F. McCarthy

LENOW & McCARTHY
13 Pelham Island Road
Wayland, MA 01778
(508) 358-8181
(508) 358-8989 (fax)

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

P. 2

verizon

Make progress every day

Billing Da. 01/22/04 Page 9 of 10
Telephon mber: 508 820 9238
Account: 508 820 9238 933 006 1
How to Reach Us: See page 2

Attachment A

## Verizon Enterprise Solutions

### FirmRate Plus Calling Plan (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 12/16 | 10:29am | Kensington | MD | 301 468-3789 | | Flat | 3.6 | 0.25 |
| 2. | 12/16 | 10:38am | Kensington | MD | 301 468-3789 | | Flat | 1.8 | 0.13 |
| 3. | 12/16 | 1:12pm | Eprovidnce | RI | 401 438-0542 | | Flat | 1.2 | 0.08 |
| 4. | 12/16 | 1:28pm | Eprovidnce | RI | 401 438-0542 | | Flat | 1.2 | 0.08 |

**For 508 820-3346** $0.54

### Calls on 508 820-9238 FRAMINGHAM MA

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| *Domestic* | | | | | | | | | |
| 5. | 12/18 | 12:27pm | Portland | ME | 207 318-0881 | | Flat | 0.4 | 0.03 |
| 6. | 12/29 | 10:57am | Kensington | MD | 301 468-3752 | | Flat | 0.5 | 0.04 |

**For 508 820-9238** $0.07

### Calls on 508 820-9239 FRAMINGHAM MA

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| *Domestic* | | | | | | | | | |
| 7. | 12/15 | 10:09am | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 8. | 12/15 | 10:14am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 9. | 12/15 | 10:19am | Kensington | MD | 301 468-3742 | | Flat | 8.4 | 0.59 |
| 10. | 12/16 | 9:55am | Providence | RI | 401 383-3639 | | Flat | 3.7 | 0.26 |
| 11. | 12/16 | 10:06am | Providence | RI | 401 383-3560 | | Flat | 0.3 | 0.02 |
| 12. | 12/16 | 10:12am | Kensington | MD | 301 468-3742 | | Flat | 1.9 | 0.13 |
| 13. | 12/16 | 10:43am | Providence | RI | 401 241-8930 | | Flat | 1.2 | 0.08 |
| 14. | 12/16 | 11:39am | Woonsocket | RI | 401 767-2267 | | Flat | 0.8 | 0.06 |
| 15. | 12/16 | 11:56am | Eprovidnce | RI | 401 434-0551 | | Flat | 17.6 | 1.23 |
| 16. | 12/16 | 12:28pm | Providence | RI | 401 270-6658 | | Flat | 0.4 | 0.03 |
| 17. | 12/16 | 12:30pm | Providence | RI | 401 461-7589 | | Flat | 4.8 | 0.34 |
| 18. | 12/16 | 1:00pm | Pawtucket | RI | 401 723-1907 | | Flat | 0.6 | 0.04 |
| 19. | 12/16 | 1:08pm | Providence | RI | 401 226-6232 | | Flat | 1.1 | 0.08 |
| 20. | 12/16 | 1:23pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.8 | 0.13 |
| 21. | 12/16 | 1:31pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.5 | 0.04 |
| 22. | 12/16 | 2:19pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.3 | 0.09 |
| 23. | 12/17 | 11:45am | N Deering | ME | 207 797-8397 | | Flat | 0.9 | 0.06 |
| 24. | 12/17 | 1:40pm | N Deering | ME | 207 797-8397 | | Flat | 5.4 | 0.38 |
| 25. | 12/17 | 2:00pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 26. | 12/19 | 8:33am | Kensington | MD | 301 871-4821 | | Flat | 0.6 | 0.04 |
| 27. | 12/22 | 11:19am | Woonsocket | RI | 401 767-2267 | | Flat | 4.9 | 0.34 |
| 28. | 12/22 | 2:29pm | Kensington | MD | 301 468-3742 | | Flat | 2.7 | 0.19 |
| 29. | 12/23 | 9:03am | Kensington | MD | 301 468-3752 | | Flat | 0.9 | 0.06 |
| 30. | 12/23 | 10:38am | Kensington | MD | 301 468-3742 | | Flat | 3.9 | 0.27 |
| 31. | 12/23 | 11:52am | Eprovidnce | RI | 401 434-0551 | | Flat | 3.1 | 0.22 |
| 32. | 12/29 | 10:12am | Woonsocket | RI | 401 767-2267 | | Flat | 2.8 | 0.20 |
| 33. | 12/29 | 10:34am | Kensington | MD | 301 468-3752 | | Flat | 0.9 | 0.06 |
| 34. | 12/29 | 10:57am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 35. | 1/05 | 12:57pm | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 36. | 1/05 | 1:15pm | Kensington | MD | 301 468-3742 | | Flat | 2.9 | 0.20 |
| 37. | 1/06 | 2:21pm | Kensington | MD | 301 468-3742 | | Flat | 15.7 | 1.10 |
| 38. | 1/12 | 9:40am | Kensington | MD | 301 468-3742 | | Flat | 3.1 | 0.22 |
| 39. | 1/12 | 9:46am | Kensington | MD | 301 468-3742 | | Flat | [illegible] | [illegible] |
| 40. | 1/12 | 10:10am | Kensington | MD | 301 468-3742 | | Flat | 4.4 | 0.31 |

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon
*Make progress every day*

Billing Da[illegible] /22/04 Page 10 of 10
Telephone N[illegible]ber: 508 820 9238
Account: 508 820 9238 933 006 1
How to Reach Us: See page 2

## Verizon Enterprise Solutions

**FirmRate Plus Calling Plan** (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 1/12 | 10:43am | Kensington | MD | 301 468-3742 | | Flat | 4.0 | 0.28 |
| 2. | 1/12 | 10:50am | Kensington | MD | 301 468-3742 | | Flat | 6.0 | 0.42 |
| 3. | 1/12 | 12:01pm | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 4. | 1/12 | 12:31pm | Eprovidnce | RI | 401 434-0551 | | Flat | 2.2 | 0.15 |
| 5. | 1/12 | 12:34pm | Providence | RI | 401 463-9048 | | Flat | 0.5 | 0.04 |
| 6. | 1/12 | 12:48pm | Kensington | MD | 301 468-3742 | | Flat | 3.2 | 0.22 |
| 7. | 1/12 | 2:38pm | Kansascity | MO | 816 502-4269 | | Flat | 1.1 | 0.08 |
| 8. | 1/13 | 10:38am | Fairlee | VT | 802 333-4326 | | Flat | 1.0 | 0.07 |

| | |
|---|---|
| For 508 820-9239 | $8.60 |
| Total | $9.21 |
| Total FirmRate Plus Calling Plan | $9.21 |
| Total Usage detail | $9.21 |

**Type indicates special service included**

*2 Payphone Surcharge*
*4 Directory Assist Call Completion Surcharge*
*6 Operator Assist Surcharge*
*8 Payphone & Call Completion Surcharge*
*9 Payphone & Operator Assist Surcharge*
*P Rated at Premium Service Termination*

**Taxes, surcharges and other fees**

**Surcharges and other fees**

| | |
|---|---|
| 9. Universal Service Fund Surcharge | $0.97 |
| **Taxes** | |
| 10. Federal | $0.42 |
| **State** | |
| 11. MA Tax | $0.69 |
| **Total Taxes, surcharges and other fees** | $2.08 |

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon

*Make progress every day*

Billing Date: [illegible]2/04 Page 9 of 10
Telephone Number: 508 820 9238
Account: 508 820 9238 933 006 1
How to Reach Us: See page 2

## Verizon Enterprise Solutions

**Switched Outbound** (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 2/11 | 10:16am | Kensington | MD | 301 933-8600 | | Flat | 9.2 | 0.64 |
| 2. | 2/11 | 3:15pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.3 | 0.09 |

**For 508 820-9238** $1.08

**Calls on 508 820-9239 FRAMINGHAM MA**

*Domestic*

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 3. | 1/19 | 11:04am | Woonsocket | RI | 401 767-2267 | | Flat | 2.0 | 0.14 |
| 4. | 1/19 | 11:39am | Eprovidnce | RI | 401 438-2004 | | Flat | 0.8 | 0.06 |
| 5. | 1/19 | 11:55am | Eprovidnce | RI | 401 438-2004 | | Flat | 2.4 | 0.17 |
| 6. | 1/19 | 12:00pm | Eprovidnce | RI | 401 434-0551 | | Flat | 2.8 | 0.20 |
| 7. | 1/20 | 10:35am | Kensington | MD | 301 933-8600 | | Flat | 4.2 | 0.29 |
| 8. | 1/20 | 12:35pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 9. | 1/20 | 2:47pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 10. | 1/20 | 3:16pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.6 | 0.04 |
| 11. | 1/20 | 3:19pm | Kansascity | MO | 816 502-4262 | | Flat | 1.0 | 0.07 |
| 12. | 1/21 | 10:10am | Pawtucket | RI | 401 726-6488 | | Flat | 0.5 | 0.04 |
| 13. | 1/21 | 11:12am | Pawtucket | RI | 401 726-6488 | | Flat | 6.5 | 0.46 |
| 14. | 1/21 | 11:44am | Eprovidnce | RI | 401 434-0551 | | Flat | 1.8 | 0.13 |
| 15. | 1/21 | 11:49am | Providence | RI | 401 461-7589 | | Flat | 3.5 | 0.25 |
| 16. | 1/21 | 2:16pm | Kensington | MD | 301 933-8600 | | Flat | 3.4 | 0.24 |
| 17. | 1/21 | 2:35pm | Kensington | MD | 301 468-3785 | | Flat | 1.2 | 0.08 |
| 18. | 1/21 | 2:41pm | Kensington | MD | 301 468-3785 | | Flat | 0.8 | 0.06 |
| 19. | 1/21 | 3:15pm | Woonsocket | RI | 401 767-2267 | | Flat | 1.0 | 0.07 |
| 20. | 1/22 | 11:01am | Kensington | MD | 301 468-3742 | | Flat | 2.4 | 0.17 |
| 21. | 1/26 | 9:32am | Providence | RI | 401 226-6232 | | Flat | 0.6 | 0.04 |
| 22. | 1/26 | 9:52am | Kensington | MD | 301 468-3742 | | Flat | 18.0 | 1.26 |
| 23. | 1/26 | 10:10am | Portsmouth | RI | 401 683-5119 | | Flat | 5.7 | 0.40 |
| 24. | 1/26 | 1:01pm | Kensington | MD | 301 468-3742 | | Flat | 3.1 | 0.22 |
| 25. | 1/26 | 2:02pm | Portsmouth | RI | 401 683-5119 | | Flat | 0.3 | 0.02 |
| 26. | 1/26 | 2:03pm | Portsmouth | RI | 401 683-5119 | | Flat | 0.9 | 0.06 |
| 27. | 1/28 | 11:46am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 28. | 1/29 | 10:10am | Kensington | MD | 301 468-3742 | | Flat | 1.7 | 0.12 |
| 29. | 2/02 | 1:07pm | Kensington | MD | 301 468-3742 | | Flat | 6.6 | 0.46 |
| 30. | 2/02 | 1:31pm | Portsmouth | RI | 401 683-5119 | | Flat | 6.2 | 0.43 |
| 31. | 2/02 | 1:47pm | Kensington | MD | 301 468-3742 | | Flat | 0.5 | 0.04 |
| 32. | 2/02 | 1:48pm | Kensington | MD | 301 468-3746 | | Flat | 2.4 | 0.17 |
| 33. | 2/02 | 2:31pm | Nowoodstok | NH | 603 745-8549 | | Flat | 5.3 | 0.37 |
| 34. | 2/03 | 2:07pm | Eprovidnce | RI | 401 434-0551 | | Flat | 3.0 | 0.21 |
| 35. | 2/03 | 2:22pm | Providence | RI | 401 463-9048 | | Flat | 0.4 | 0.03 |
| 36. | 2/05 | 12:04pm | Portsmouth | RI | 401 683-5119 | | Flat | 3.8 | 0.27 |
| 37. | 2/05 | 12:23pm | Kensington | MD | 301 933-8600 | | Flat | 2.1 | 0.15 |
| 38. | 2/05 | 12:26pm | Kensington | MD | 301 933-8600 | | Flat | 2.3 | 0.16 |
| 39. | 2/05 | 12:29pm | Kensington | MD | 301 468-3746 | | Flat | 0.9 | 0.06 |
| 40. | 2/05 | 12:32pm | Pawtucket | RI | 401 723-1907 | | Flat | 2.3 | 0.16 |
| 41. | 2/06 | 9:38am | Kensington | MD | 301 933-8600 | | Flat | 1.1 | 0.08 |
| 42. | 2/06 | 9:52am | Kensington | MD | 301 468-3746 | | Flat | 2.7 | 0.19 |
| 43. | 2/09 | 9:26am | Providence | RI | 401 829-8131 | | Flat | 0.9 | 0.06 |
| 44. | 2/09 | 10:13am | Kensington | MD | 301 468-3742 | | Flat | 5.5 | 0.39 |
| 45. | 2/09 | 10:42am | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 46. | 2/09 | 10:47am | Portsmouth | RI | 401 683-5119 | | Flat | 0.4 | 0.03 |
| 47. | 2/09 | 12:31pm | Eprovidnce | RI | 401 434-0551 | | Flat | 12.9 | 0.90 |

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon Make progress every day



## Verizon Enterprise Solutions

**Switched Outbound** (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 2/09 | 12:55pm | Kensington | MD | 301 468-3742 | | Flat | 3.8 | 0.27 |
| 2. | 2/10 | 8:58am | Woonsocket | RI | 401 767-2267 | | Flat | 9.8 | 0.69 |
| 3. | 2/10 | 9:27am | Kensington | MD | 301 468-3742 | | Flat | 2.8 | 0.20 |
| 4. | 2/10 | 9:30am | Kensington | MD | 301 468-3742 | | Flat | 4.3 | 0.30 |
| 5. | 2/11 | 9:30am | Woonsocket | RI | 401 767-8513 | | Flat | 0.5 | 0.04 |
| 6. | 2/11 | 10:15am | Kensington | MD | 301 933-8600 | | Flat | 0.3 | 0.02 |
| 7. | 2/11 | 1:30pm | Kensington | MD | 301 468-3742 | | Flat | 2.4 | 0.17 |
| 8. | 2/11 | 3:02pm | Kensington | MD | 301 468-3742 | | Flat | 2.3 | 0.16 |
| 9. | 2/11 | 3:13pm | Providence | RI | 401 461-7589 | | Flat | 2.0 | 0.14 |
| 10. | 2/12 | 12:35pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.0 | 0.07 |

**For 508 820-9239** $11.13

**Total Switched Outbound** $12.29

**Total FirmRate Plus Calling Plan** $12.29
**Total Usage detail** $12.29

**Type indicates special service included**

*2 Payphone Surcharge*
*4 Directory Assist Call Completion Surcharge*
*6 Operator Assist Surcharge*
*8 Payphone & Call Completion Surcharge*
*9 Payphone & Operator Assist Surcharge*
*P Rated at Premium Service Termination*

**Taxes, surcharges and other fees**
**Surcharges and other fees**
11. Universal Service Fund Surcharge $1.20
**Taxes**
12. Federal $0.52
**State**
13. MA Tax $0.85

**Total Taxes, surcharges and other fees** $2.57

rue Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Lenow & McCarthy
ATTORNEYS AT LAW

Cheryl Hazeltine
Legal Administrator

Howard B. Lenow
Sheilah F. McCarthy

Attachment
B

February 24, 2004

BY CERTIFIED MAIL/RETURN RECEIPT REQUESTED
and
REGULAR FIRST CLASS MAIL

Mr. Peter Vican
Homestead Baking Company
145 North Broadway
Rumford, RI 02916

RE: BCTGM Local 348 – Health Insurance Grievance

Dear Mr. Vican:

On behalf of BCTGM, Local 348, I am writing to formally notify the company, pursuant to Article IV, Section C, that the union is referring the enclosed grievance concerning the violation of Article XXXIII (C) by failing to maintain a substantially comparable health insurance for the life of the agreement.

As you may know, under Article IV, Section D, the parties are first supposed to attempt to agree on a mutually agreeable arbitrator. The union hereby proposes that the parties appoint arbitrator James Litton. Please let me know as soon as possible if Mr. Litton is acceptable to the company. If not, I will request that the Federal Mediation and Conciliation Service provide us with a panel of five (5) arbitrators from which to choose.

Thank you for your attention to this matter. If you wish to discuss this matter, please feel free to give me a call.

Very truly yours,

Sheilah F. McCarthy

Enclosure

cc: Timothy Benjamin

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

www.masslaborlaw.com
13 Pelham Island Road ■ Wayland, Massachusetts ■ 01778
508.358.8181 ■ fax: 508.358.8989

Lenow & McCarthy
ATTORNEYS AT LAW

Cheryl Hazeltine
Legal Administrator

Howard B. Lenow
Sheilah F. McCarthy

Attachment C

March 24, 2004

Mr. Peter Vican
Homestead Baking Company
145 North Broadway
Rumford, RI 02916

Re: BCTGM Local 348 – Comparable Health Insurance Coverage

Dear Mr. Vican:

On behalf of BCTGM, Local 348, I am serving you with a copy of the Request for Arbitration Panel and related correspondence that I have filed with the Federal Mediation and Conciliation Service in the above-referenced matter. Please refer to Sheilah McCarthy's letter of February 24, 2004.

Thank you for your prompt attention to this matter.

Very truly yours,

Howard B. Lenow

HBL/cah
Enclosure

cc: Tim Benjamin

rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

www.masslaborlaw.com
13 Pelham Island Road ■ Wayland, Massachusetts ■ 0177[illegible]
508.358.8181 ■ fax: 508.358.8989

verizon

Make progress every day

Billing Da[illegible]/22/04 Page 9 of 10
Telephone N[illegible]ber: 508 820 9238
Account: 508 820 9238 933 006 1
How to Reach Us: See page 2

Attachment A

## Verizon Enterprise Solutions

### FirmRate Plus Calling Plan (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 12/16 | 10:29am | Kensington | MD | 301 468-3789 | | Flat | 3.6 | 0.25 |
| 2. | 12/16 | 10:38am | Kensington | MD | 301 468-3789 | | Flat | 1.8 | 0.13 |
| 3. | 12/16 | 1:12pm | Eprovidnce | RI | 401 438-0542 | | Flat | 1.2 | 0.08 |
| 4. | 12/16 | 1:28pm | Eprovidnce | RI | 401 438-0542 | | Flat | 1.2 | 0.08 |

**For 508 820-3346** $0.54

### Calls on 508 820-9238 FRAMINGHAM MA

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| Domestic | | | | | | | | | |
| 5. | 12/18 | 12:27pm | Portland | ME | 207 318-0881 | | Flat | 0.4 | 0.03 |
| 6. | 12/29 | 10:57am | Kensington | MD | 301 468-3752 | | Flat | 0.5 | 0.04 |

**For 508 820-9238** $0.07

### Calls on 508 820-9239 FRAMINGHAM MA

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| Domestic | | | | | | | | | |
| 7. | 12/15 | 10:09am | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 8. | 12/15 | 10:14am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 9. | 12/15 | 10:19am | Kensington | MD | 301 468-3742 | | Flat | 8.4 | 0.59 |
| 10. | 12/16 | 9:55am | Providence | RI | 401 383-3639 | | Flat | 3.7 | 0.26 |
| 11. | 12/16 | 10:06am | Providence | RI | 401 383-3560 | | Flat | 0.3 | 0.02 |
| 12. | 12/16 | 10:12am | Kensington | MD | 301 468-3742 | | Flat | 1.9 | 0.13 |
| 13. | 12/16 | 10:43am | Providence | RI | 401 241-8930 | | Flat | 1.2 | 0.08 |
| 14. | 12/16 | 11:39am | Woonsocket | RI | 401 767-2267 | | Flat | 0.8 | 0.06 |
| 15. | 12/16 | 11:56am | Eprovidnce | RI | 401 434-0551 | | Flat | 17.6 | 1.23 |
| 16. | 12/16 | 12:28pm | Providence | RI | 401 270-6658 | | Flat | 0.4 | 0.03 |
| 17. | 12/16 | 12:30pm | Providence | RI | 401 461-7589 | | Flat | 4.8 | 0.34 |
| 18. | 12/16 | 1:00pm | Pawtucket | RI | 401 723-1907 | | Flat | 0.6 | 0.04 |
| 19. | 12/16 | 1:08pm | Providence | RI | 401 226-6232 | | Flat | 1.1 | 0.08 |
| 20. | 12/16 | 1:23pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.8 | 0.13 |
| 21. | 12/16 | 1:31pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.5 | 0.04 |
| 22. | 12/16 | 2:19pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.3 | 0.09 |
| 23. | 12/17 | 11:45am | N Deering | ME | 207 797-8397 | | Flat | 0.9 | 0.06 |
| 24. | 12/17 | 1:40pm | N Deering | ME | 207 797-8397 | | Flat | 5.4 | 0.38 |
| 25. | 12/17 | 2:00pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 26. | 12/19 | 8:33am | Kensington | MD | 301 871-4821 | | Flat | 0.6 | 0.04 |
| 27. | 12/22 | 11:19am | Woonsocket | RI | 401 767-2267 | | Flat | 4.9 | 0.34 |
| 28. | 12/22 | 2:29pm | Kensington | MD | 301 468-3742 | | Flat | 2.7 | 0.19 |
| 29. | 12/23 | 9:03am | Kensington | MD | 301 468-3752 | | Flat | 0.9 | 0.06 |
| 30. | 12/23 | 10:38am | Kensington | MD | 301 468-3742 | | Flat | 3.9 | 0.27 |
| 31. | 12/23 | 11:52am | Eprovidnce | RI | 401 434-0551 | | Flat | 3.1 | 0.22 |
| 32. | 12/29 | 10:12am | Woonsocket | RI | 401 767-2267 | | Flat | 2.8 | 0.20 |
| 33. | 12/29 | 10:34am | Kensington | MD | 301 468-3752 | | Flat | 0.9 | 0.06 |
| 34. | 12/29 | 10:57am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 35. | 1/05 | 12:57pm | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 36. | 1/05 | 1:15pm | Kensington | MD | 301 468-3742 | | Flat | 2.9 | 0.20 |
| 37. | 1/06 | 2:21pm | Kensington | MD | 301 468-3742 | | Flat | 15.7 | 1.10 |
| 38. | 1/12 | 9:40am | Kensington | MD | 301 468-3742 | | Flat | 3.1 | 0.22 |
| 39. | 1/12 | 9:46am | Kensington | MD | 301 468-3742 | | Flat | 1.3 | 0.09 |
| 40. | 1/12 | 10:10am | Kensington | MD | 301 468-3742 | | Flat | 4.4 | 0.3[illegible] |

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon

*Make progress every day*



## Verizon Enterprise Solutions

**FirmRate Plus Calling Plan** (continued)

| no. | date | time | place | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|
| 1. | 1/12 | 10:43am | Kensington | MD 301 468-3742 | | Flat | 4.0 | 0.28 |
| 2. | 1/12 | 10:50am | Kensington | MD 301 468-3742 | | Flat | 6.0 | 0.42 |
| 3. | 1/12 | 12:01pm | Kensington | MD 301 468-3742 | | Flat | 0.3 | 0.02 |
| 4. | 1/12 | 12:31pm | Eprovidnce | RI 401 434-0551 | | Flat | 2.2 | 0.15 |
| 5. | 1/12 | 12:34pm | Providence | RI 401 463-9048 | | Flat | 0.5 | 0.04 |
| 6. | 1/12 | 12:48pm | Kensington | MD 301 468-3742 | | Flat | 3.2 | 0.22 |
| 7. | 1/12 | 2:38pm | Kansascity | MO 816 502-4269 | | Flat | 1.1 | 0.08 |
| 8. | 1/13 | 10:38am | Fairlee | VT 802 333-4326 | | Flat | 1.0 | 0.07 |

| | |
|---|---|
| For 508 820-9239 | $8.60 |
| Total | $9.21 |
| Total FirmRate Plus Calling Plan | $9.21 |
| Total Usage detail | $9.21 |

**Type indicates special service included**

2 *Payphone Surcharge*
4 *Directory Assist Call Completion Surcharge*
6 *Operator Assist Surcharge*
8 *Payphone & Call Completion Surcharge*
9 *Payphone & Operator Assist Surcharge*
P *Rated at Premium Service Termination*

**Taxes, surcharges and other fees**

| | |
|---|---|
| **Surcharges and other fees** | |
| 9. Universal Service Fund Surcharge | $0.97 |
| **Taxes** | |
| 10. Federal | $0.42 |
| **State** | |
| 11. MA Tax | $0.69 |
| **Total Taxes, surcharges and other fees** | $2.08 |

rue Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon *Make progress every day*



## Verizon Enterprise Solutions

**Switched Outbound** (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 2/11 | 10:16am | Kensington | MD | 301 933-8600 | | Flat | 9.2 | 0.64 |
| 2. | 2/11 | 3:15pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.3 | 0.09 |

**For 508 820-9238** $1.08

**Calls on 508 820-9239 FRAMINGHAM MA**

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| *Domestic* | | | | | | | | | |
| 3. | 1/19 | 11:04am | Woonsocket | RI | 401 767-2267 | | Flat | 2.0 | 0.14 |
| 4. | 1/19 | 11:39am | Eprovidnce | RI | 401 438-2004 | | Flat | 0.8 | 0.06 |
| 5. | 1/19 | 11:55am | Eprovidnce | RI | 401 438-2004 | | Flat | 2.4 | 0.17 |
| 6. | 1/19 | 12:00pm | Eprovidnce | RI | 401 434-0551 | | Flat | 2.8 | 0.20 |
| 7. | 1/20 | 10:35am | Kensington | MD | 301 933-8600 | | Flat | 4.2 | 0.29 |
| 8. | 1/20 | 12:35pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 9. | 1/20 | 2:47pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.9 | 0.06 |
| 10. | 1/20 | 3:16pm | Eprovidnce | RI | 401 434-0551 | | Flat | 0.6 | 0.04 |
| 11. | 1/20 | 3:19pm | Kansascity | MO | 816 502-4262 | | Flat | 1.0 | 0.07 |
| 12. | 1/21 | 10:10am | Pawtucket | RI | 401 726-6488 | | Flat | 0.5 | 0.04 |
| 13. | 1/21 | 11:12am | Pawtucket | RI | 401 726-6488 | | Flat | 6.5 | 0.46 |
| 14. | 1/21 | 11:44am | Eprovidnce | RI | 401 434-0551 | | Flat | 1.8 | 0.13 |
| 15. | 1/21 | 11:49am | Providence | RI | 401 461-7589 | | Flat | 3.5 | 0.25 |
| 16. | 1/21 | 2:16pm | Kensington | MD | 301 933-8600 | | Flat | 3.4 | 0.24 |
| 17. | 1/21 | 2:35pm | Kensington | MD | 301 468-3785 | | Flat | 1.2 | 0.08 |
| 18. | 1/21 | 2:41pm | Kensington | MD | 301 468-3785 | | Flat | 0.8 | 0.06 |
| 19. | 1/21 | 3:15pm | Woonsocket | RI | 401 767-2267 | | Flat | 1.0 | 0.07 |
| 20. | 1/22 | 11:01am | Kensington | MD | 301 468-3742 | | Flat | 2.4 | 0.17 |
| 21. | 1/26 | 9:32am | Providence | RI | 401 226-6232 | | Flat | 0.6 | 0.04 |
| 22. | 1/26 | 9:52am | Kensington | MD | 301 468-3742 | | Flat | 18.0 | 1.26 |
| 23. | 1/26 | 10:10am | Portsmouth | RI | 401 683-5119 | | Flat | 5.7 | 0.40 |
| 24. | 1/26 | 1:01pm | Kensington | MD | 301 468-3742 | | Flat | 3.1 | 0.22 |
| 25. | 1/26 | 2:02pm | Portsmouth | RI | 401 683-5119 | | Flat | 0.3 | 0.02 |
| 26. | 1/26 | 2:03pm | Portsmouth | RI | 401 683-5119 | | Flat | 0.9 | 0.06 |
| 27. | 1/28 | 11:46am | Kensington | MD | 301 468-3742 | | Flat | 0.3 | 0.02 |
| 28. | 1/29 | 10:10am | Kensington | MD | 301 468-3742 | | Flat | 1.7 | 0.12 |
| 29. | 2/02 | 1:07pm | Kensington | MD | 301 468-3742 | | Flat | 6.6 | 0.46 |
| 30. | 2/02 | 1:31pm | Portsmouth | RI | 401 683-5119 | | Flat | 6.2 | 0.43 |
| 31. | 2/02 | 1:47pm | Kensington | MD | 301 468-3742 | | Flat | 0.5 | 0.04 |
| 32. | 2/02 | 1:48pm | Kensington | MD | 301 468-3746 | | Flat | 2.4 | 0.17 |
| 33. | 2/02 | 2:31pm | Nowoodstok | NH | 603 745-8549 | | Flat | 5.3 | 0.37 |
| 34. | 2/03 | 2:07pm | Eprovidnce | RI | 401 434-0551 | | Flat | 3.0 | 0.21 |
| 35. | 2/03 | 2:22pm | Providence | RI | 401 463-9048 | | Flat | 0.4 | 0.03 |
| 36. | 2/05 | 12:04pm | Portsmouth | RI | 401 683-5119 | | Flat | 3.8 | 0.27 |
| 37. | 2/05 | 12:23pm | Kensington | MD | 301 933-8600 | | Flat | 2.1 | 0.15 |
| 38. | 2/05 | 12:26pm | Kensington | MD | 301 933-8600 | | Flat | 2.3 | 0.16 |
| 39. | 2/05 | 12:29pm | Kensington | MD | 301 468-3746 | | Flat | 0.9 | 0.06 |
| 40. | 2/05 | 12:32pm | Pawtucket | RI | 401 723-1907 | | Flat | 2.3 | 0.16 |
| 41. | 2/06 | 9:38am | Kensington | MD | 301 933-8600 | | Flat | 1.1 | 0.08 |
| 42. | 2/06 | 9:52am | Kensington | MD | 301 468-3746 | | Flat | 2.7 | 0.19 |
| 43. | 2/09 | 9:26am | Providence | RI | 401 829-8131 | | Flat | 0.9 | 0.06 |
| 44. | 2/09 | 10:13am | Kensington | MD | 301 468-3742 | | Flat | 5.5 | 0.39 |
| 45. | 2/09 | 10:42am | Kensington | MD | 301 468-3742 | | Flat | 2.5 | 0.18 |
| 46. | 2/09 | 10:47am | Portsmouth | RI | 401 683-5119 | | Flat | 0.0 | |
| 47. | 2/09 | 12:31pm | Eprovidnce | RI | 401 434-0551 | | Flat | 12.9 | 0.90 |

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

verizon

Make progress every day



## Verizon Enterprise Solutions

**Switched Outbound** (continued)

| no. | date | time | place | | number | type | rate | min. | amount |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 2/09 | 12:55pm | Kensington | MD | 301 468-3742 | | Flat | 3.8 | 0.27 |
| 2. | 2/10 | 8:58am | Woonsocket | RI | 401 767-2267 | | Flat | 9.8 | 0.69 |
| 3. | 2/10 | 9:27am | Kensington | MD | 301 468-3742 | | Flat | 2.8 | 0.20 |
| 4. | 2/10 | 9:30am | Kensington | MD | 301 468-3742 | | Flat | 4.3 | 0.30 |
| 5. | 2/11 | 9:30am | Woonsocket | RI | 401 767-8513 | | Flat | 0.5 | 0.04 |
| 6. | 2/11 | 10:15am | Kensington | MD | 301 933-8600 | | Flat | 0.3 | 0.02 |
| 7. | 2/11 | 1:30pm | Kensington | MD | 301 468-3742 | | Flat | 2.4 | 0.17 |
| 8. | 2/11 | 3:02pm | Kensington | MD | 301 468-3742 | | Flat | 2.3 | 0.16 |
| 9. | 2/11 | 3:13pm | Providence | RI | 401 461-7589 | | Flat | 2.0 | 0.14 |
| 10. | 2/12 | 12:35pm | Eprovidnce | RI | 401 434-0551 | | Flat | 1.0 | 0.07 |

| | |
|---|---|
| **For 508 820-9239** | $11.13 |
| **Total Switched Outbound** | $12.29 |
| **Total FirmRate Plus Calling Plan** | $12.29 |
| **Total Usage detail** | $12.29 |

**Type indicates special service included**

*2 Payphone Surcharge*
*4 Directory Assist Call Completion Surcharge*
*6 Operator Assist Surcharge*
*8 Payphone & Call Completion Surcharge*
*9 Payphone & Operator Assist Surcharge*
*P Rated at Premium Service Termination*

**Taxes, surcharges and other fees**

**Surcharges and other fees**

| | |
|---|---|
| 11. Universal Service Fund Surcharge | $1.20 |
| **Taxes** | |
| 12. Federal | $0.52 |
| **State** | |
| 13. MA Tax | $0.85 |
| **Total Taxes, surcharges and other fees** | $2.57 |

rue Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
**LABOR ARBITRATION TRIBUNAL**

Case Number: 04-04982

Grievance: Failing to Maintain Substantially Comparable Health Insurance

Before: John J. Mark

---

In the matter of Arbitration Between

B.C.T.W. Local 348

and

Homestead Baking Company

---

## AWARD OF THE ARBITRATOR

I, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above parties and dated and having duly sworn and having heard the proofs and allegations of the parties, award as follows: that the grievance be upheld, that the instant matter before this arbitrator is arbitrable.

Signature John J. Mark

Date 10-19-2004

rue Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
**LABOR ARBITRATION TRIBUNAL**

Case Number: 04-04982

---

In the matter of Arbitration Between

B.C.T.W. Local 348

and

Homestead Baking Company

---

## ISSUE

Was the grievance filed by the Union B.C.T.W. Local 348 untimely, and thus not arbitrable? If not, what shall be the remedy?

## BACKGROUND AND ARGUMENTS

I would like the readers to know from the outset that I am going to examine the exhibits, evidence, testimony and briefs in the order that they were submitted, commenting on the evidence as I go. The reason for this procedure is that I would like the parties to be convinced that their arguments were heard, that the system used to decide this case was a fair one, and that the results make sense.

rue Copy Attest
Offic… Cour…
Counties of Providence & Bristo…
Providence, Rhode Island

This arbitration is a result of a grievance filed by the union. Union Exhibit #2 and Management Exhibit #7. The hearing in this matter was held Tuesday October 5, 2004 at 10:00 a.m. at the Ramada Inn in Seekonk, Massachusetts. The company was represented by Mr. Peter Vican, President of Homestead Baking Company and the union was represented by Ms. Sheilah McCarthy, Esquire.

The issue was framed and all those to testify were sworn in. The company made a opening statement claiming that there is a threshold issue that must be decided "arbitrability and that issue must be decided first" before the merits of the main case can be heard. The union took great exception to this threshold issue claiming that they were prepared to put on their entire case and that the company should have come prepared to arbitrate the merits of the case after the arbitrator ruled "a bench decision" on the arbitrability aspect of the case. Mr. Vican stated emphatically that he was not prepared to go beyond the threshold issue at this time and that he would retain counsel at a later date if needed.

The company stated that the union failed to meet the time line requirements of the grievance procedure in the collective bargaining agreement and thus there is no case before us at this time. The company's opening statement went on to cite the stipulated agreement that covers medical coverage for members of the bargaining unit. At this time the following exhibits were admitted into evidence: Management #1, 2, 3, 4, 5, 6, 7 ,8 , along with Joint #1 and Union # 1, 2, 3, and 4. The company went on to cite Joint Exhibit #1, "The Contract," and mentioned December 18, 2003 as a critical date in the issue of time lines. The company alleges that this is the date when the company notified the union of the changes in the health and medical insurance programs. The stipulation agreement was mentioned again and the contract was cited in regards



True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

to time lines and insurance language. The company finished up by stating that the union waited fifty days before filing a grievance. There was some talk about employee's filling out health care cards as well as conversations in regards to United Health Care, Blue Cross Blue Shield and benefits packages. The witness was cross examined in regards to negotiations that involved the health plan. Flex Plan 500. Management Exhibit #3. the stipulation agreement. Management Exhibit #6. the fax with attachments. the current and new plans and what differences. if any. there are between them. Flex Plan 10-20 and Management #6 again. The witness was asked when he did he sit down and negotiate the health plan "the new plan" with the union specifically. and the witness replied that the grievance was filed fifty days after the union was notified and the dates discussed were December 18, 2003, February 1, 2004 and February 6, 2004.

The witness, Mr. Vican, stated that he received no correspondence or complaints prior to February 6, 2004 from the union in regards to the new health plan. Mr. Vican also stated that the health plan became part of the contract via the stipulated agreement, see Management Exhibit #3 and that this incorporation took place on December 18, 2003. There was conversation that the remedy sought could cost $150,000.00 if the company was to go back to Plan 10-20. There was also conversation in regards to whether any employees sought out of pocket expenses because of the difference in deductibles and out-of-network expenses. The union's first witness was Mr. Timothy Benjamin who testified as to his background, Business Agent and former President of Local 348. The witness went on to state that Homestead has fifty people working at their plant and that he negotiated the current contract as well as the last two successor agreements. The witness was referred to Joint Exhibit #1, the contract, as well as Management #3, the stipulation. The witness stated that he was present at all the negotiation



True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

sessions as was Mr. Peter Vican. The testimony now turned to Management #3 again, the 10-20 Flex Plan, Flex Plan 500, and Management #6, the fax with attachments. The witness stated very emphatically that he called the employer, Mr. Vican, five or six times in an attempt to discuss the health and welfare plan. The witness stated that each time he called he left a message as to the purpose of his call and that none of the calls were returned. The witness testified that he was not told the effective date of the medical plan and instead he was told that on February 1, 2004 the plan was implemented. The witness testified that he told the company that he "the union" had to be informed of any changes prior to implementation. There was some conversation regarding changes in deductibles, co-payments, out of pocket expenses and the question of arbitrability

The witness was cross examined in regards to prior negotiations, specifically any inference to medical plans current or new as well as to telephone calls allegedly left on the company's voice mail by the witness in regards to the new medical plan, as well as prior negotiations, voice mail messages, a prior medical insurance arbitration case, and labor disputes at the plant. The stipulated agreement was mentioned again as well as Union Exhibit #2 and there was talk of payments the plan offered and how comparable the new plan was to the old plan.

The grievance was discussed again as well as Union Exhibit #2 and the conversation now centered more on the five or more telephone calls that the union claims it made to the company protesting the implementation of the new medical plan. The witness claimed in cross examination that he left a voice mail message each time he called and none of the telephone calls were returned to him by the company. There was a reference made to Management Exhibit #7 and the witness stated that the company told him that they were going to be a "impose the



rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

new plan" period. Management Exhibit #4 was discussed and the witness was excused. The next witness was Mr. Art Montminy. International Vice President of the union. who testified as to his background leading up to his history with the company concerning negotiations and the medical plan the employees currently enjoyed. Mr. Art Montminy stated that he was present at all negotiation sessions and that there was much conversation during negotiations regarding health care programs. co-pays. deductibles. and out of pocket expenses. etc. The witness testified that the union wanted other health care quotes because they had "concerns." Union Exhibit #4. "a comparison" was discussed and the witness stated <u>nothing</u> was ever said by the union that it was okay to impose a medical plan on their membership without the union's approval and further that no such approval was ever given. The witness went on to testify that the union never requested a change in insurance coverage. The union representative stated that the company made a proposal in negotiations that there be a change that any change would be substantially comparable to the old plan. The witness stated that the union told the company that they wanted substantially the same benefits in any new plan that was to be offered to their membership. Union Exhibit #3 was discussed and the witness was cross examined.

The cross examination touched on a contract extension. Union Exhibit #1. Flex Plans 10-20 and 500. there were references to the grievance. the stipulated agreement, prior proposals. Union Exhibit #4 and various other health care plans. The union had further questions of the witness regarding the stipulated agreement. article 33 of the collective bargaining agreement and the witness stated that <u>never</u> was there an agreement between the company and the union to implement a new health plan. The witness finished up his testimony answering questions put forth by the company related to Flex Plan 500. co-payments and deductibles. Both sides rested

rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence. Rhode Island

their cases and a date certain for briefs was agreed upon.

The first brief that I shall read and comment on is from the union and contains a cover letter. Union Exhibit #2. Union Exhibit #3 and the brief on arbitrability. This brief lays out the issue. the grievance arbitration language and has a fact section that deals with the company's obligation to furnish a health insurance plan to the employees represented by this collective bargaining agreement. The brief goes on to give a history including Mr. Montminy's testimony that Mr. Vican came to the bargaining table asking for some flexibility to explore other options in health insurance plans. The brief goes on to mention that the union came to the table seeking to maintain their health insurance benefits, in particular the fact that the employer continue to pay 100% of the premium and also to keep out of pocket expenses to a minimum. The stipulation agreement is referred to as was the testimony on Mr. Benjamin and Mr. Montminy in regards to health insurance. The Plan 500 and Plan 10-20 are again referred to along with Joint Exhibit #1, Management Exhibit #3, other testimony and notes from Mr. Vican were also mentioned in reference to Plan 38B and the December 18, 2003's fax. The brief goes on to state that Mr. Benjamin tried to contact Mr. Vican to register his objection to the new health benefits by calling his office numerous times, leaving messages regarding the health care problem on his voice mail. The brief goes on to discuss Plan 38B, the increased deductibles, co-pays as well as telephone calls made to the company from the union, and the demand for arbitration.

The argument section of the brief mentions the grievance procedure, Mr. Benjamin's role in the filing of the grievance, Mr. Vican's response to the grievance filing, the collective bargaining agreement, Joint Exhibit #1, Management Exhibit #3, and also cites Elkouri & Elkouri, *How Arbitration Works*. The brief went on to discuss the time lines between each st



True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

of the grievance procedure and finished up with a request that this arbitrator find that the company failed to carry its burden of proof that the grievance is not arbitrable and so the arbitrator is requested to order that the parties proceed to schedule another day of hearing to allow the parties to present their respective cases on the merits. The company filed a brief in this matter dated October 8, 2004. This brief cites testimony from Mr. Benjamin and Mr. Montminy, also mentioned are Flex Plan 500, the stipulation agreement and health plan language. The brief goes on to state that the date that the plan became available to the union was known to the union and that further Mr. Benjamin did not look at the plan until he came back from vacation on December 22, 2003. The brief goes on to assert that the union waited fifty days before filing a grievance. The brief goes on to cite the grievance procedure and also that the company signed long term agreements with a health care provider and also paid for two months premiums in advance. The brief went on to say that when Mr. Banjamin grieved the situation he was told it was too late, too late to grieve and too late to change back. The stipulation was again mentioned as well as the fact that the union was responsible for the wording in the stipulated agreement. The brief finished up with a statement that this grievance is not arbitrable.

This arbitrator also did receive a letter from the company dated October 14, 2004 the letter mentioned the telephone calls that the union claims to have made to the company as well as company telephone calls to the union in regards to the health care situation. The letter also addresses the timeliness of the calls as well as making some unusual assertions. The letter states that the union never came to the plant or faxed the company on this important issue. Note: This letter did come in after the fact so this arbitrator admitted it and gave it the weight he felt it deserved.



rue Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

**DISCUSSION AND FINDINGS**

This arbitrator has examined nine pages of notes. thirteen exhibits including the collective bargaining agreement. two briefs and one reply letter and concludes that the grievance shall be upheld and deemed arbitrable for the following reasons:

1. The testimony of Mr. Benjamin was believable in that he testified that he got complaints from members of the union and that he immediately called the company for the purpose of registering a complaint. Mr. Benjamin stated that he called five or more times and the union's exhibit of telephone calls from the union to the Homestead Baking Company seems to corroborate this. Note: I will agree with Mr. Vican's assessment at the hearing that a call could have been made to the company for someone other than Mr. Vican. the shop steward etc. and the telephone bill would not show that. I do believe that the union complained about the changes <u>once</u> they saw them in writing or experienced a change in the deductibles or co-pay arrangements. I must agree again with the company's position that it would have been better if the union wrote a timely letter or sent a fax or even a e-mail instead of calling on the telephone. None the less. a telephone complaint is still a valid complaint and the unshaken testimony of Mr. Benjamin was that he made five or more calls to the company each time leaving a voice mail message that he was complaining about the health insurance problem and he stated that not one of the telephone calls was returned.

2. I would cite Elkouri & Elkouri, *How Arbitration Works*. chapter 6. page 299. Determining arbitration when an existing dispute is taken to arbitration by a joint submission of the parties there ordinarily is no problem of arbitrability since by the submission the parties identify the dispute and agree to its arbitration. A different situation may be presented however. when a party invokes the arbitration clause of a collective agreement by a demand or notice of intent to arbitrate a dispute that has arisen during the terms of the agreement. Here arbitration may be resisted by the other party on the ground that the dispute is not arbitrable. It may be asserted for instance, that the case does not involve any of the types of disputes that are covered by the arbitration clause. or that while covered by the arbitration clause the dispute is not arbitrable because some condition precedent to arbitration. such as exhaustion of the grievance procedure or <u>timely notice of intent to arbitrate</u>. has not been met.

3. Also from Elkouri & Elkouri. as might be expected. reasonable excuse for failure to meet notice requirements or the presence of other justification for the arbitrator not to enforce such requirements strictly may prevent a forfeiture of the right of arbitration. In such cases jurisdiction will be assumed and the dispute will be decided on the merits. This was true where the parties in the past had mutually accepted loose interpretation of their contractual time limits. A reasonable excuse may be a good faith mistake or difference of



True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

4. opinion, or it may be the unavoidable absence of an essential party, so as to make the observance of time limits impracticable.

For all the reasons given, I sustain the grievance and order the parties to notify this arbitrator of available dates for a hearing on the merits of the case.

Very Truly Yours,

John J. Mark: John J. Mark

Date: 10-19-2004



rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island